# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DUSTIN SURI | : | |
| | : | |
| Plaintiff | : | |
| | : | CIVIL ACTION NO. |
| | : | 3:20-cv-01694-VAB |
| v. | : | |
| | : | |
| WOLTERS KLUWER ELM SOLUTIONS, INC. | : | AMENDED COMPLAINT |
| JONAH PARANSKY, BARRY ADER, | : | |
| KAREN SEKLEY D'ANDREA and | : | |
| LISA WEREMEICHIK | : | JURY TRIAL DEMANDED |
| | : | |
| in their individual and professional capacities, | : | |
| | : | DECEMBER 30, 2020 |
| Defendants | : | |

## AMENDED COMPLAINT

The Plaintiff DUSTIN SURI by and through his attorneys, BERLINGIERI LAW, PLLC,
as and for his Amended Complaint in this action against the Defendants WOLTERS KLUWER
ELM SOLUTIONS, INC., JONAH PARANSKY, BARRY ADER, KAREN SEKLEY
D'ANDREA and LISA WEREMEICHIK in their individual and professional capacities,
respectfully alleges upon information and belief as follows:

## NATURE OF CASE

1.     Plaintiff complains pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42

U.S.C.§§ 2000e *et seq.* as amended ("Title VII") (discrimination sex (sexual orientation) and

retaliation), the Americans with Disabilities Act as amended  42 U.S.C.§ 12101 *et seq.*

("ADA") (discrimination, failure to accommodate, and retaliation), the Family Medical Leave

Act as amended 29 U.S.C. § 2601 *et seq.* (retaliation),  and the Connecticut Fair Employment

1

Practices Act, Conn. Gen. Stat. § 46a-60 *et seq.* ("CEFPA"), (hostile work environment, discrimination based on sex, (sexual orientation) and disability, retaliation,) and claims as to all individual defendants intentional infliction of emotional distress negligent infliction of emotional distress and *prima facie* tort.

2.     Plaintiff seeks monetary relief including, but not limited to: compensatory and punitive damages; attorney's fees and the costs of this action; together with any and all other appropriate legal and equitable relief pursuant to applicable state and federal law.

## PROCEDURAL HISTORY

3.     Plaintiff brought this suit in Connecticut State Superior Court, on or about October 14, 2020, against defendant Wolters Kluwer ELM Solutions, Inc.

4.     On November 11, 2020, Defendant filed a removal petition pursuant to, U.S.C. §§ 1331, 1332, 1367(a), 1441 and 1446, and removed this action to this Court.

5.     On November 11, 2020, Defendant filed a motion for an extension of time to respond to the Complaint, the Court granted said motion on November 16, 2020 and set the answer deadline to December 18, 2020.

6.     On December 10, 2020, Plaintiff filed a motion to substitute counsel, the Court granted said motion on December 17, 2020.

7.     On December 16, 2020, Plaintiff, sought leave to amend the Complaint until December 30, 2020 and extend Defendant's time to respond thereto until January 19, 2021, the Court granted said motion on December 17, 2020.

8.     This action arises under Title VII, FMLA and ADA and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 *et seq*. and for tort claims against the employer and individual defendants.

9.      Venue is proper in the District of Connecticut pursuant to 28 U.S.C. § 1391 (b) in that Plaintiff's claims arose in this district, the Plaintiff worked in this district, and the Defendant conducts business and provides services to individuals and businesses in this district.

10.     Supplemental jurisdiction over Plaintiff's state law claims is invoked pursuant to 28 U.S.C. § 1367, as the claims arise out of the same transaction and occurrences as the Plaintiff's federal claims. The Court also has jurisdiction pursuant to 29 U.S.C. §2617; 28 U.S.C. §1331, §1343 and pendent jurisdiction thereto.

11.     Costs, expert witness fees and attorney's fees are sought pursuant to 42 U.S.C. § 1988.

12.     Plaintiff filed timely claims with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC") on or about May 7, 2019 and Amended on or about August 16, 2019, against Wolters Kluwer ELM Solutions, Inc., (CHRO Case No. 1920512 – EEOC No. 16A-2019-101315).

13.     On November 4, 2020, the EEOC, issued Plaintiff a Notice of Right to Sue annexed hereto as **Exhibit A**.

14. On July 17, 2020, the CHRO issued Plaintiff a Release of Jurisdiction, annexed hereto as **Exhibit B**.

## THE PARTIES

15.     Plaintiff Dustin Suri is a current resident of the State of Illinois, who during all relevant times complained of herein resided in Chicago, Illinois, and worked for Defendant Wolter Kluwer ELM Solutions, Inc., in Hartford, Connecticut and commuted between Chicago and Hartford regularly for work.

16.     Defendant Wolters Kluwer ELM Solutions, Inc., ("WK") is a Delaware corporation based in Houston, Texas, with offices in Hartford, Connecticut, that provides among other things legal publishing and web services.

17.     Upon information and belief, Defendant Jonah Paransky ("Mr. Paransky") was and is a resident of the State of Texas and is WK's General Manager, in Hartford, Connecticut.

18.     Upon information and belief, Defendant Barry Ader ("Mr. Ader") was and is a resident of the Commonwealth of Massachusetts and is WK's Vice President of Product Management and Marketing, in Hartford, Connecticut.

19.     Upon information and belief, Defendant Karen Sekley D'Andrea ("Ms. Sekley D'Andrea") was and is a resident of the State of Connecticut and is WK's Head of Marketing, in Hartford, Connecticut.

20.     Upon information and belief, Defendant Lisa Weremeichik ("Ms. Weremeichik") was and is a resident of the Commonwealth of Massachusetts and is WK's Product Marketing Director, in Hartford, Connecticut.

## BACKGROUND FACTS

21.     Plaintiff's sex/gender is male and Plaintiff's sexual orientation is gay.

22.     Plaintiff suffers from disabilities specifically, Generalized Anxiety Disorder, Obsessive Compulsive Disorder (OCD,) and informed Defendants of his GAD and OCD upon hire, Plaintiff was diagnosed with Post Traumatic Stress Disorder (PTSD) after he went out on leave as further described below due to his hostile work environment and retaliation of the Defendants, and Plaintiff's disabilities qualify as disabilities under the ADA and CFEPA, and qualify for leave under the FMLA.

23.    Plaintiff worked  forty hours per week for WK as a full-time employee, within the meaning of the Title VII, FMLA, ADA and CFEPA

24.    WK employs more than 50 employees.

25.    The Defendants knew that Plaintiff was gay and treated him differently on that basis.

26.    The Defendants knew that Plaintiff was disabled and forced him to take leave for his condition and treated him differently on that basis.

27.    Plaintiff was a qualified individual with a disability, capable of performing the essential duties of the positions at issue in this case either without accommodations or with reasonable accommodations.

28.    Plaintiff is also an individual who is associated with persons with disabilities in that both his father and another close family member are disabled. Plaintiff's father has cancer, and another close family member has been diagnosed with personality disorders and impulse control issues.

29.    In February 2018, Plaintiff interviewed for a Director of Product Marketing position and for a position as Senior Product Marketing Manager for Growth Products, for the Respondent, reporting directly to Ms. Sekley D'Andrea.

30.    In February 2018, WK offered Plaintiff the Senior Product Manager for Growth Products position.

31.    On or about April 2018, Ms. Sekley D'Andrea announced that Ms. Weremeichik would be promoted (from the same position that Plaintiff held) to the, Director of Product Management, wherein she would manage the Plaintiff.

32.    Ms. Sekley D'Andrea never had a direct one-on-one conversation with Plaintiff about his change to reporting to Ms. Weremeichik.  Ms. Sekley D'Andrea, she left it to Ms. Weremeichik to speak with Plaintiff about the new reporting structure.

33.    Before accepting the position, in February 2018, Plaintiff had numerous discussions with Ms. Sekley D'Andrea in which Plaintiff explained that he had certain caretaking responsibilities with respect to Plaintiff's father and other family members.

34.    Plaintiff explained to Ms. Sekley D'Andrea that Plaintiff would need to travel back and forth between Connecticut and Illinois and work remotely. When Ms. Sekley D'Andrea asked how long this would need to go on, Plaintiff explained that it would be indefinite.

35.    Ms. Sekley D'Andrea asked if Plaintiff expected the Company to pay for the trips and Plaintiff assured her that he would not. Based on this, she agreed that Plaintiff could work remotely part of the time and in the Connecticut office part of the time. Ms. Sekley D'Andrea explained to Plaintiff that she did not have an issue with this if Plaintiff could arrange to be in the Connecticut office as needed for important meetings.

36.    Plaintiff indicated that Plaintiff understood and that this would not be a problem.

37.    After Plaintiff began working, he continued to be open about his gay lifestyle and his care-giving responsibilities.

38.    Plaintiff made clear to Ms. Sekley D'Andrea during the interview process about his sexual orientation when he made it clear that his Partner, Earl Stoner, was also a caretaker to Plaintiff's father.  Additionally, a few months into Plaintiff's tenure, Ms. Sekley D'Andrea interviewed Plaintiff's same-sex Partner, Mr. Stoner, for an open position as a Content Marketing Manager at WK.

39.     Plaintiff first met Mr. Ader, the Vice President of Product Management and Marketing, over the phone for a fifteen-minute conversation, and subsequently face to face, a few weeks after Plaintiff started working at WK.

40.     By Plaintiff's mere presence, Mr. Ader seemed uncomfortable having a gay man working with him. And one that carried on care-taking duties that were associated with women and in direct conflict with Mr. Ader's belief system.  Mr. Ader vocalized his disdain and his discomfort with present day social norms.  And sex stereotyped Plaintiff's responsibilities and doing a job of a feminine person, a "woman's job."

41.     On at least three occasions, Mr. Ader said, "people like **you** need to get their emotions in check."

42.     On information and belief, this was a reference to stereotypes about gay men being overly emotional.

43.     Mr. Ader did not have the same negative reaction to a straight man or woman who expressed emotion. Instead, his distaste for any kind of emotion by Plaintiff seemed causally related to Plaintiff's sexual orientation. In fact, Mr. Ader had a special 'thing' for the thin young ladies that pretended to idolize him and who particularly owned dogs like he did.  Mr. Ader took these female employees out to dinner all the time on both personally and professionally.

44.     Mr. Ader even had a problem being in the same room with Plaintiff without another individual.  It was clear that Plaintiff's sexual orientation clearly bothered Mr. Ader.

45.     Upon information and belief, Mr. Ader could not fathom or comprehend the undertaking that Plaintiff took on as a caretaker.  And, instead of applauding his efforts, he and his duo of puppeteers did whatever was necessary to make it as awful as possible for Plaintiff until he

decided to quit. Plaintiff felt that Mr. Ader's inappropriate question of asking why Plaintiff's mother or another female could not do the caregiving – was totally unacceptable, inappropriate, and ignorant. But Mr. Ader did not care about rules. He did as he deemed necessary as-a-means-to an end.

46.     When Plaintiff explained that his mother had died, Mr. Ader asked why another female could not take on the role of caretaker. Upon information and belief the line of questioning was more of Mr. Ader's insensitive ways and views about gay males who he believed were not masculine. Much of Mr. Ader's comments throughout Plaintiff's tenancy surround masculinity.

47.     When Mr. Ader saw that the teasing, mocking, abuse, and discrimination was not working as fast as he wanted, he started to retaliate and use the telecommuting agreement that Plaintiff and Ms. Sekley D'Andrea entered as leverage for further discrimination, verbal abuse, and attacks. This was another avenue for Barry Ader to pursue with his co-conspirators. All done in hopes of pushing Plaintiff to leave the company; to quit. On information and belief, Mr. Ader, and his chorale (Ms. Sekley-D'Andrea and Ms. Weremeichik) were going to use any tool in their toolkit to discriminate, mock, and pock-fun at Plaintiff and disabled members of his family. Anything having to do with Plaintiff's caretaking and being gay was brought up by Mr. Ader, Ms Sekley-D'Andrea, and Ms. Weremeichik.

48.     Upon information and belief, Mr. Ader did not like that Plaintiff was permitted to telecommute in order to care of Plaintiff's disabled family members.

49.     However, the majority of Mr. Ader's team worked remotely. Many staff members worked full-time from home, some from Arizona, Denver, Colorado and other areas in Chicago, and California. Mr. Ader said that Plaintiff's position was meant to be based in Hartford to create

cohesion between Product Marketing and the Product Management team that Plaintiff supported. Yet, the majority of Product Managers did not sit in Hartford. Many sat in Houston, Texas. One or two that did sit in Harford did not work out of the office more than one day a week

50. For example, another similarly situation Product Marketing Colleague of Plaintiff's Jennifer Vodvarka, who held a title of Senior Product Marketing Manager, informed Plaintiff that she worked from the office less than 20% of the time telecommuting.

51. For the first two months of Plaintiff's employment with the respondent, there was little activity in Plaintiff's role. Plaintiff was told that the products Plaintiff supported were significantly delayed. There were numerous members of the team that left the organization. This made it difficult for Plaintiff to meet any benchmarks. However, Plaintiff did his best to learn about the products.

52. As mentioned above, in or around April 2018, Ms. Weremeichik became the new Product Marketing Director.

53. In May, 2018, Plaintiff was told that he would report directly to her.

54. Ms. Weremeichik changed Plaintiff's duties, explaining that Plaintiff would be moved to work on a different product line. There was no discussion around this. It was a mandate. Another tactic being used to squeeze the Plaintiff out of the organization through retaliative measures.

55. Ms. Weremeichik moved Plaintiff from the growth product sector to their longstanding product. "Passport".

56. Rather than messaging and launching exciting new products, Plaintiff's job would be working on trying to find new ways to position a product that was already market saturated.

57.     Ms. Weremeichik provided Plaintiff poor communication about this new role, or why Plaintiff was being moved.

58.     Moreover, Ms. Weremeichik failed to provide Plaintiff any new goals and accomplishments for Plaintiffs review and bonus consideration. Plaintiff tried to succeed in this new role. In addition, Plaintiff looked for other open positions within the company There were old goals that were documented in the Company-wide Review System and every time Plaintiff brough up having those updated, Ms. Weremeichik was either too busy or did not care. Plaintiff tried to succeed in his new role but Ms. Weremeichik, Mr. Ader and Ms. Sekley-D'Andrea never carved a path for that.  It became evident to Plaintiff that with no new goals or accomplishments in the system, Mr. Ader and team were going to use that as leverage at review time to state that Plaintiff did not accomplish anything and lay out a Performance Improvement Plan ("PIP").  It was a known fact that Mr. Ader used this tactic in many instances before with individuals that he ousted at WK previously.

59.      In fact, there were several meetings between Mr. Ader and Plaintiff where Mr. Ader encouraged Plaintiff to quit.

60.     During 2018, one of Plaintiff's family members assaulted Plaintiff on several occasions. In or about late April 2018, Plaintiff was late to a telephone call with Ms. Weremeichik because of having to deal with a medical professional about Plaintiff's father's care. Ms. Weremeichik shouted at Plaintiff. Plaintiff explained to Ms. Weremeichik on the call and after the call that Plaintiff had just been assaulted. This was not unusual behavior for Ms. Weremeichik.  She called it being 'direct' while Plaintiff and other members of the Product Marketing Team called it bullying.  Mr. Suri reported it to HR on numerous occasions.

10

61.     A few days later, Mr. Ader spoke to Plaintiff his physical assault and his need to "fight back" and not to be a "patsy if that is possible."

62.     When Plaintiff said, "[E]xcuse me", Mr. Ader, replied that Plaintiff needed to "toughen up".

63.     On information and belief, these disparaging comments were related to his views about Plaintiff's being gay, and his stereotypes about gay men.

64.     It was at this time that Mr. Ader started to exclude Plaintiff from meetings that were essential to Plaintiff's job function and then reprimand him afterwards for not attending.

65.     Mr. Ader also began to exclude Plaintiff from meetings that were essential to Plaintiff's new job function as well as excluded Plaintiff from calls.

66.      Plaintiff discovered that Mr. Ader was purposely not inviting Plaintiff to the meetings as another element to document in his versioned narrative in Plaintiff's Performance Review. Plaintiff heard from other key stakeholders about meetings that were taking place.

67.     They voiced concerns as to why Plaintiff was not in attendance. Mr. Ader used the constant excuse of "there must be an oversight" as to why Plaintiff was not invited to meetings.

68.     Simultaneously, Ms. Weremeichik continued to have belligerent conversations with Plaintiff.  Plaintiff started to have enough of the verbal abuse and bulling and responded in kind and said that he was not going to take the abuse any longer and hung up on Ms. Weremeichik.

69.     Starting on or about on May 2018, Mr. Ader questioned why Plaintiff at every meeting thereafter with him, was with the company still.  His consistent statement to Plaintiff was: "you are clearly unhappy, why don't you leave?"

70.     On or about June 2018, Plaintiff went to Human Resources and reported that Plaintiff felt

that Mr. Ader was discriminating against Plaintiff because of his sexual orientation. Plaintiff

reported the comments that he had made. They did not address these concerns at all and instead

in July 2018, Gail Rodgers, (WK human resources) referred to Plaintiff as a "problem child"

that needed to get Plaintiff's personal issues in order. Plaintiff informed Ms. Rodgers that he

was seeking therapy for anxiety. Plaintiff also met with Ms. Rodgers previously in May 2018.

No investigation was ever conducted, nothing was ever done.

71.     Between June and October, the situation at home worsened. Plaintiff became more nervous

and jumpier and startled at meetings. Plaintiff disclosed this. In the fall Plaintiff began to see

a therapist. Plaintiff disclosed this to Mr. Ader, Ms. Sekley D'Andrea and Ms. Weremeichik.

Plaintiff was mocked for this by each of these individuals and was often teased by these very

same colleagues at work, who acted like children instead of adults at the workplace.

72.     Mr. Ader would ask Plaintiff what was wrong with Plaintiff and would tell Plaintiff to

"man up" and "toughen up". Again, on information and belief Plaintiff would not have been

treated this way had Plaintiff not been gay. Mr. Ader also referred to Plaintiff as a "loose

cannon" once he learned that Plaintiff was seeking mental health treatment. Mr. Ader continued

his discriminatory comments towards Plaintiff by making statements like: 'make sure you get

your head screwed on properly as I do not understand the choices you have made

73.     In October 2018, Plaintiff went back to Human Resources and again complained about

harassment due to Plaintiff's sexual orientation. Again, no action was taken. This initial

complaint from Plaintiff to WK was escalated to the General Manager of the Business, Jonah

Paransky, however Mr. Paransky failed to follow up with Plaintiff from this October 2018

email.

12

74.     In November 2018, Ms. Weremeichik had a Team Call with all of her direct reports on the Product Marketing Team. She outlined the process for development of the Performance Appraisals/reviews. Ms. Weremeichik mentioned that she, Ms. Sekley D'Andrea and Mr. Ader would provide input into the review. In fact, Jennifer Vodvarka brought up the so called 'Barry Curve' on the call. This curve is where Barry overrules scores.

75.     Prior to Ms. Weremeichik developing her part of Appraisals, all her team members were required to score themselves based on previously established goals and accomplishments to those goals. However, the goals that were loaded into the system for Plaintiff were goals that were outlined for Plaintiff's original job. No new goals had ever been established when Plaintiff had Plaintiff's role changed in April/May 2018. Despite this, Plaintiff went into the system and did the best Plaintiff could.

76.     At the end of 2018, Ms. Sekley D'Andrea, asked Plaintiff during a 1-on-1 conversation when Plaintiff's father would "die" or be at the end of his life.

77.     In or around January 2019, Plaintiff e-mailed the General Manager, Jonah Paransky, about all the on-going issues with Barry Ader's discriminatory treatment due to Plaintiff's sexual orientation. Plaintiff was referred to Human Resources.

78.     Plaintiff continued to be isolated at work, and to get push back for needing to telecommute, even though similarly situated employees who were not gay men could do so.

79.         In January 2019, there were two instances where Mr. Ader made comments evidencing animus related to Plaintiff's sexual orientation. In one meeting, he reprimanded Plaintiff and said Plaintiff was acting "like a petulant schoolgirl."

80.      Later in January, 2019, at a Marketing All Hands Meeting in Houston, Texas, Mr. Ader approached Plaintiff for looking different and said that he could not put his finger on it, and

then said "oh, Plaintiff got it - you did not shave. You look more macho. Way to go." Mr. Ader then proceeded to touch Plaintiff's shoulder with a 'at-a-boy' type of pat of false encouragement and smiled at Plaintiff.  Causing Plaintiff extreme emotional distress.

81.     This again was mocking Plaintiff's sexual orientation, telling Plaintiff on one occasion that Plaintiff looked much more "macho", and on another occasion criticizing Plaintiff by saying that Plaintiff was acting, "like a schoolgirl".

82.     It was after these comments from Mr. Ader to Plaintiff in Houston, when laintiff decided he needed to take leave and applied for leave , with the support of his mental healthcare provider.

83.     In early February 2019, Plaintiff applied for FMLA and short-term disability leave ("STD") due to the hostile work environment that was created by Mr. Ader, Ms. Sekley D'Andrea, Ms. Weremeichik and Mr. Paransky. The day after filing FMLA and STD, Ms. Weremeichik, approach the Plaintiff quietly and apologized for everything that she did to cause me to go on leave.  Plaintiff made it clear to her that there was no way that she was getting off that easy.

84.     However, Plaintiff continued to work through February 26, 2019.

85.     Once Plaintiff applied for leave, Plaintiff's annual review was rescheduled 3 times on the calendar by Plaintiff's supervisor, Ms. Weremeichik.

86.      Upon Plaintiff's application and approval for leave, Plaintiff went into the Plaintiff's Learning Portal and noticed that the Portal was locked down and stated that the Review was under a change status as of February 20, 2019.

87.     The WK performance reviews were due for finalization by January 15, 2020 and not February 20, 2020.  Clearly a change was made within days of Plaintiff's FMLA STD Leave Approval and a score adjustment was made.

14

88. The annual review process for Plaintiff determines the yearly bonus pay-out.

89. A few days before Plaintiff's departure for leave, Plaintiff received via Skype, video conferencing from his manager the day after Plaintiff went out on FMLA and STD

90. The written review did not align with at all what she was delivering verbally. Plaintiff's overall rating score provided was a 2 out of 5. Plaintiff was told that Plaintiff was being put on a PIP.

91. The evaluation was false and did not accurately reflect Plaintiff's performance. The criticism was false.

92. The overall review score of a 2 out of 5 affected Plaintiff's bonus income tremendously. Instead of receiving $19,500, Plaintiff received $6,500. Mr. Ader changed at the last moment to a 2.0 from a 2.5  Mr. Barry further explained that a 2.0 would have been a 'meets expectation' and provided Plaintiff with an additional $40,000 of bonus versus the $6,500 Plaintiff instead received.

93. Plaintiff has been unable to work since on or about February 26, 2019 that was diagnosed in early of March 2019 associated with the hostility and intentional infliction of emotional distress by Mr. Ader, Ms. Sekley-D'Andrea, and Ms. Weremechik.

94. Additionally, Mr. Paransky is complicit by allowing such a pervasive culture to exist and not doing anything at all to stop the culture of discrimination based on sexual orientation and disability.

95. Mr. Ader informed Plaintiff that he was emotionally unstable, for everything you are doing and going thru, specifically citing Plaintiff's care giving duties and Plaintiff being attacked by a family member, and then suddenly dismissed Plaintiff.

15

96.　　On May 8, 2019, Plaintiff emailed the Company's CEO Chief Executive Officer of Wolters Kluwer, Richard Flynn, and the Chief Financial Officer (CFO) Nancy McKinstry ("Ms. McKinstry"), Maryjo Charbonnier, Chief Human Resources Officer to inform them of the Defendants' misconduct.

97.　　On May 8, 2019, Ms. McKinstry emailed Plaintiff back, "Dustin, thank you for bringing this to our attention. We take your concerns seriously and will begin an investigation. Once I confirm who is the best person to do that, I will follow-up with you directly."

98.　　Ms. McKinstry never followed up with Plaintiff directly.

99.　　Ms. McKinstry assigned HR representative, Sonia Durante, ("Ms. Durante") to investigate Plaintiff's May 8, 2019 email complaint about the defendants and the company as a whole.

100.　　Ms. Durante failed to adequately investigate and did not thoroughly follow up with Plaintiff.

101.　　In or around May 2019, Plaintiff requested a reasonable accommodation to apply to other positions or transfer, but WK denied Plaintiff the ability to apply internally or transfer.

102.　　On October 31, 2019, Plaintiff's STD leave ended and Plaintiff was approved for long-term disability ("LTD") leave. However, due to the third-party LTD provider's leave policy, WK had to separate employment with Plaintiff in order to approve the LTD with the third-party provider.

103.　　Plaintiff needed to contact HR in order discharge him from employment, order to receive LTD.

104.　　Plaintiff ended LTD, on December 7, 2020.

105.　　By the above conduct Plaintiff have been subjected to severe and/or pervasive harassment because of sexual orientation. This was humiliating and upsetting.

16

106.    By the above-described conduct, Plaintiff have been subjected to a hostile work environment because of sexual orientation in violation of CFEPA, and because of Plaintiff's sex, due to stereotyping about how males are expected to behave in violation of Title VII, in that the repeated and constant harassment that Plaintiff have been subjected to has been sufficiently severe or pervasive to materially alter the conditions of Plaintiff's employment. A reasonable person would have found the workplace to be hostile and abusive because of Plaintiff's sexual orientation and Plaintiff have found the workplace to be hostile and abusive.

107.    By the above-described conduct, Plaintiff have also been discriminated against because of Plaintiff's sexual orientation, gender, disability and/or association with persons with disabilities, and/or have been retaliated against because of Plaintiff's protected conduct in internally complaining of discrimination and otherwise opposing the respondent's discriminatory and harassing treatment. Specifically, by the conduct described above, the respondent discriminated and retaliated against Plaintiff, including by giving Plaintiff a poor evaluation, and placing Plaintiff on a PIP in violation of the ADA and CFEPA, and otherwise violated these Acts.

108.    The Defendant WK's stated reasons for its conduct are false and are a pretext for discrimination and retaliation.

109.    The Defendant WK engaged in the above discriminatory and retaliatory conduct with malice or with reckless indifference to the Plaintiff's rights. The violation was willful within the meaning of Title VII, the ADA and CFEPA.

110.    As a result of the Defendant WK's discriminatory acts and violations of Title VII, the ADA and CFEPA, Plaintiff has suffered significant damages in the form of lost wages; benefits and

other attendant rights, privileges and conditions of employment, and have suffered emotional distress, pain and suffering, humiliation and mental anguish.

111.    The Defendant WK denied Plaintiff a reasonable accommodation, by not allowing him the opportunity to apply internally withing the company or transfer while still employed but out on leave.

112.    The Defendant WK failed to engage in the interactive process with Plaintiff on internal applications for employment within the company.

113.    Plaintiff's doctor recommended that Plaintiff work with others than Mr. Ader's group and that Plaintiff could work elsewhere in the company, at the time of this request, while he was on leave.

114.    The Defendant WK's conduct as to Plaintiff violated the FMLA as they retaliated against Plaintiff for taking leave by constructive discharge.

115.    Plaintiff is qualified for the position he held and is ready willing and able to work.

## AS AND FOR A FIRST CAUSE OF ACTION
## FOR DISCRIMINATION UNDER TITLE VII as to the employer Defendant only

116.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

117.    Title VII states in relevant part as follows: SEC. 2000e-2. [Section 703] (a) Employer practices: It shall be an unlawful employment practice for an employer - (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; . . .

118. Defendant the employer Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by allowing discrimination based on sex/gender and causing a hostile work environment.

119. Defendant violated the above and Plaintiff suffered numerous damages as a result.

**AS AND FOR A SECOND CAUSE OF ACTION**
**FOR RETALIATION UNDER TITLE VII as to the employer Defendant only**

120. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

121. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a) provides that it shall be unlawful employment practice for an employer: "(1) to . . . discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

122. The employer Defendants engaged in unlawful employment practice prohibited by 42 U.S.C. §2000e *et seq.* by retaliating against Plaintiff with respect to the terms, conditions or privileges of employment because of his opposition to the unlawful employment practices of the employer Defendants.

123. The employer Defendants violated the above and Plaintiff suffered numerous damages as a result.

**AS AN FOR THE THIRD CAUSE OF ACTION**
**DISCRIMINATION IN VIOLATION**
**OF THE AMERICANS WITH DISABILITIES ACT**
**as to the employer Defendant only**

124. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

19

125.   Plaintiff claims Defendant WK violated Title I of the Americans with Disabilities Act of 1990 (Pub. L. 101-336) (ADA), as amended, as these titles appear in volume 42 of the United States Code, beginning at section 12101.

126.   SEC. 12112. [Section 102] specifically states "(a) General Rule. - No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

127.   Defendant WK violated the section cited herein by failing to consider Plaintiff's requests for a reasonable accommodation, as well as discharging, creating and maintaining discriminatory working conditions, and otherwise discriminating and retaliating against the Plaintiff because of his sex, sexual orientation, disability and for having complained of discrimination.

128.   Defendant WK violated the above and Plaintiff suffered numerous damages as a result.

**AS AND FOR THE FOURTH CAUSE OF ACTION**
**RETALIATION IN VIOLATION OF THE AMERICAN WITH DISABILITES ACT**
**as to the employer Defendant only**

129.   Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

130.   SEC. 12203. [Section 503] states, "(a) Retaliation. - No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

131.   Defendant WK violated the above and Plaintiff suffered numerous damages as a result.

20

## AS AN FOR THE FIFTH CAUSE OF ACTION
## RETALIATION IN VIOLATION
## OF FAMILY MEDICAL LEAVE ACT as to the employer Defendant only

132.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

133.    Plaintiff took FMLA leave pursuant to 29 U.S.C. § 2601 et seq. for his disabilities.

134.    Plaintiff took 12 weeks of FMLA leave.

135.    Defendant constructively discharged Plaintiff after taking FMLA leave.

136.    Defendant WK violated the above and Plaintiff suffered numerous damages as a result.

## AS AN FOR THE SIXTH CAUSE OF ACTION
## DISCRIMINATION IN VIOLATION
## OF CONN. GEN. STAT. § 46a60(A)(1) as to the employer Defendant only

137.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

138.    Plaintiff was treated in a disparate manner in the terms and conditions of his employment, on the basis of sex and sexual orientation and disabilities.

139.    The employer Defendants' conduct is unlawful and in violation of CFEPA.

140.    As a result of the employer Defendants' unlawful conduct, Plaintiff has suffered, and will continue to suffer damages, including but not limited, to substantial lost wages, fringe benefits, health insurance, retirement and pension benefits, mental and emotional distress and the ability to enjoy life's pleasures.

141.    Plaintiff seeks damages as a result of Defendants' unlawful conduct.

## AS AND FOR THE SEVENTH CAUSE OF ACTION
## RETALIATION IN VIOLATION
## OF CONN. GEN. STAT. §46a-60(a)(4) as to the employer Defendant only

142. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

143. Plaintiff engaged in protected activity under the CFEPA by complaining to Defendant about harassment and discrimination.

144. Defendant created a hostile work environment due to Plaintiff's employment because of his prior complaints.

145. The adverse employment actions to which Plaintiff was subjected were the direct consequence and in retaliation for Plaintiff's opposition to unlawful discrimination.

146. The Defendant's actions violate CFEPA.

147. As a result of the foregoing conduct, Plaintiff has suffered and will continue to suffer damages that include but are not limited to: lost or reduced wages, fringe benefits, health insurance benefits, and pension payments; emotional and psychological distress, stress, anxiety; physical injury; and the loss of the ability to enjoy life's pleasures and activities.

**AS AND FOR THE EIGHTH CAUSE OF ACTION**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS as to all individual Defendants**

148. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

149. As described above, the individual Defendants willfully intended to cause Plaintiff emotional distress.

150. Defendants' conduct was extreme and outrageous.

151. Defendants' actions were harmful and offensive to the Plaintiff and would be harmful and offensive to any reasonable person.

152. Defendants' actions did in fact cause the Plaintiff to suffer severe emotional distress.

## AS AND FOR THE NINTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS as to all individual
## Defendants

153.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

154.    As described above, the individual Defendants knew or should have known that they intended to cause Plaintiff emotional distress.

155.    Defendants' conduct was extreme and outrageous.

156.    Plaintiff was in the zone of danger from Defendants' actions, and it could be foreseeable that their actions could or would cause emotional distress upon the Plaintiff.

157.    Defendants' in perpetrating the above-described conduct, inflicted emotional distress as a result of terminating Plaintiff accusing of him of malfeasance and forcing him out of the workplace after he complained.

158.    Defendants' actions were harmful and offensive to the Plaintiff and would be harmful and offensive to any reasonable person.

159.    Defendants' actions did in fact cause the Plaintiff to suffer severe emotional distress.

## AS AND FOR THE TENTH CAUSE OF ACTION
## *PRIMA FACIE* TORT as to all individual Defendants

160.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

161.    All individual Defendants commenced a pattern of reckless, negligent, discriminatory and retaliatory proceedings against the Plaintiff culminating in a hostile work environment and no investigation thereafter, and then further causing retaliation after Plaintiff engaged in protected activity by complaining to Defendants multiple times about the frequent misconduct at WK,

ultimately leading to Plaintiff's constructive discharge, as a result of the Defendants extreme
and outrageous conduct Plaintiffs have been harmed.

## DEMAND FOR A JURY TRIAL

162.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands a trial by jury on all
claims in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

A.     A judgment declaring that the practices complained of herein are unlawful and in
willful violation of the aforementioned federal; and state laws;

B.     Awarding Plaintiff compensatory damages;

C.     Awarding Plaintiff punitive damages;

D.     Awarding Plaintiff costs and disbursements incurred in connection with this action,
including reasonable attorneys' fees, expert witness fees, and other costs;

E.     Pre-judgment and post-judgment interest, as provided by law; and

F.     Granting Plaintiff further relief as this Court finds necessary and proper.

Dated: New York, New York
       December 30, 2020

Respectfully submitted,

By:    *Christopher J. Berlingieri*
        CHRISTOPHER J. BERLINGIERI, ESQ.
        (ct 30335)
        BERLINGIERI LAW, PLLC
        *Attorney for Plaintiff*
        244 Fifth Avenue, Suite F276
        New York, New York 10001
        Tel.:    (347) 766-5105
        Fax:    (914) 730-1044
        Email: cjb@nyctlaw.com

24

# EXHIBIT A

EEOC Form 161 (11/16)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

| To: | **Dustin Suri**<br>**2951 S. King Drive, Apt. 1302**<br>**Chicago, IL 60616** | From: | **Boston Area Office**<br>**John F. Kennedy Fed Bldg**<br>**15 New Sudbury Street, Room 475**<br>**Boston, MA 02203** |
|---|---|---|---|

|  | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | | |
|---|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **16A-2019-01315** | **Amon L. Kinsey, Jr.,**<br>**Supervisory Investigator** | **(617) 865-3672** |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

| | |
|---|---|
| [ ] | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| [ ] | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
| [ ] | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| [ ] | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| [ ] | The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge. |
| [ ] | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| [X] | Other *(briefly state)*          **Charging Party is pursuing claims in another forum.** |

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

_____          November 4, 2020

**Feng K. An,**                                                      *(Date Mailed)*
**Area Office Director**

Enclosures(s)

cc:

    **WOLTERS KLUWER ELM SOLUTIONS**
    **20 Church Street**
    **Hartford, CT 06103**

EXHIBIT B

**STATE OF CONNECTICUT**
**COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES**



Dustin Suri
**COMPLAINANT**

CHRO No. 1910512
EEOC No. 16A-2019-01314

v.

Wolters Kluwer Elm Solutions, Inc.
**RESPONDENT**

### RELEASE OF JURISDICTION

The Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint. The Complainant is authorized to commence a civil action in accordance with CONN. GEN. STAT. § 46a-100 against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred, in which the Complainant resides or in which the Respondent transacts business. If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

A copy of any civil action brought in accordance with this release must be served on the Commission by email at ROJ@ct.gov or by regular U.S. mail at 450 Columbus Blvd. – Suite 2, Hartford, CT 06103 at the same time all other parties are served. Service by email is preferred. **THE COMMISSION MUST BE SERVED BECAUSE IT HAS A RIGHT TO INTERVENE IN ANY ACTION BASED ON A RELEASE OF JURISDICTION PURSUANT TO CONN. GEN. STAT. § 46a-103.**

The Complainant must bring an action in Superior Court within 90 days of receipt of this release and within two years of the date of filing the complaint with the Commission unless circumstances tolling the statute of limitations are present.

**DATE:**  July 17, 2020

_Tanya R. Hughes_

Tanya A. Hughes, Executive Director

cc:  Mary E. Kelly, Esq., via email: mekelly@lapm.org
Elizabeth S. Torkelsen, Esq., via email: etorkelsen@ebglaw.com