UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---------------------------------------x
DUSTIN SURI,

    Plaintiff,

v.

WOLTERS KLUWER ELM
SOLUTIONS, INC., BARRY ADER,
KAREN SEKLEY-D'ANDREA, and
LISA WEREMEICHIK,

    Defendants.
---------------------------------------x

Case No. 3:20-cv-01694

July 14, 2023

**DEFENDANTS' LOCAL RULE 56(a)1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

  Defendants, Wolters Kluwer ELM Solutions, Inc., Barry Ader, Karen Sekley-D'Andrea, and Lisa Weremeichik, (hereinafter, collectively, "Defendants"), submit this Statement of Undisputed Material Facts, pursuant to Local Rule 56(a)(1) in support of their Motion for Summary Judgment Dismissing the Amended Complaint of Plaintiff, Dustin Suri ("Plaintiff").

**The Parties**

  1. Wolters Kluwer ELM Solutions goes to market as ELM Solutions, a Wolters Kluwer business unit (hereinafter "Wolters Kluwer" or the "Company"). It is a market-leading provider of enterprise legal management and spend software, contract lifecycle management, and legal analytics solutions. Wolters Kluwer's primary location is in Hartford, Connecticut, and it has another office in Houston, Texas. (Declaration of Barry Ader ("Ader Decl.") at ¶ 3; Excerpts of the transcript of the deposition of Barry Ader, attached as Ex. A, at 22.)

  2. Defendant Barry Ader ("Ader") is the Vice President, Product Marketing and Management, for Wolters Kluwer. (Amend. Complaint, attached as Ex. B, ¶ 18; Answer to the

1

Amend. Complaint, ("Answer"),[1] attached as Ex. C, ¶ 18.) Defendant Karen Sekley-D'Andrea ("Sekley-D'Andrea") is the Head of Marketing for Wolters Kluwer. (Ex. B, ¶ 19; Ex. C, ¶ 19.) Defendant Lisa Weremeichik ("Weremeichik") is the former Director of Product Marketing for Wolters Kluwer. (Ex. B, ¶ 20; Ex. C, ¶ 20.)

**<u>Wolters Kluwer Hired Plaintiff In February 2018</u>**

3. In February 2018, Wolters Kluwer hired Plaintiff as a Senior Product Marketing Manager, and he began working for Wolters Kluwer on February 26, 2018. (February 6, 2018 Offer Letter, attached as Ex. D; Ex. B, ¶ 32.)

4. Plaintiff reported to Sekley-D'Andrea until April 2018, when he began reporting to Weremeichik following her promotion to Director of Product Marketing. (Ex. B, ¶ 29, 31.)

5. As a Senior Product Marketing Manager, Plaintiff worked with product management, sales and account management, marketing communications, and other teams within the organization to ensure the effective implementation of Wolters Kluwer's products and business go-to-market strategy. (Senior Product Marketing Manager job description, attached as Ex. E.)

6. During Plaintiff's interview, he told Sekley-D'Andrea, that he lived in Chicago and wanted to work partially remotely, so he could travel back to Chicago to help take care of his father. Sekley-D'Andrea told him that the position required that he be in the Hartford office three days a week, but that he could work from wherever he chose on the other two days. ((Ex. B, ¶¶ 15, 33-36; Declaration of Karen Sekley-D'Andrea ("Sekley-D'Andrea Decl." ) at ¶ 4.)

7. Plaintiff's offer letter and job description also explicitly state that his position is based in Hartford, that he was expected to report to the Hartford office, and that the position is not

---

[1] Each defendant filed a separate Answer to Plaintiff's Amended Complaint. All references to "Answer" herein are references to the Answer of the corporate defendant, Wolters Kluwer. The individual defendants' answers differ from the corporate defendant's answers only inasmuch as the individuals lack personal knowledge of certain allegations.

fully remote. (Ex. D; excerpts of Plaintiff's deposition transcript, attached as Ex. F, at 20-21.)

8. There are no managers in *Product Marketing* who work remotely full-time, although some *Product Management* managers work fully remotely. (Ex. A at 31-32)[2].

9. Over time, Plaintiff began spending even longer periods working remotely. At one point, he was permitted to work alternating weeks in Hartford and in Chicago. While the Company was flexible with Plaintiff in light of his circumstances, the Company never agreed to make this remote arrangement full-time. It is undisputed that the Company never denied Plaintiff the ability to work a partial remote schedule and he, in fact, worked partially remotely until he went on FMLA leave in February 2019. (Ex. A at 39-40; Ex. F at 39.)

10. Plaintiff admitted he was only required to be physically present in a Wolters Kluwer office on two occasions that he had not already planned to be there: once in Hartford, for which he was given 48 hours' notice; and once in Houston, for which he was given eight days' notice. (Ex. F at 47-48, 51-53.)

**Plaintiff Complained About The Products To Which He Was Assigned.**

11. Two of the three growth products that Plaintiff had expected to work on were delayed; however, Plaintiff did work extensively on the third growth product, Legal Holds. Due to these delays, Plaintiff was assigned to work on two existing core technology products, Passport and TyMetrix 360, in addition to Legal Holds. (Ex. F at 157-58, 163-64.) Passport and TyMetrix 360 were, and are, among the Company's most important products. (Decl. of Sekley-D'Andrea at

---

[2] In late 2017, Ader required new Product Marketing staff to report to their physical office on a more regular and frequent basis because, in his business judgment, greater in-person collaboration and accountability would improve the performance of the Product Marketing group that he considered to be underperforming. Ader did not have the same requirement for the Product Management group because he did not believe that group was underperforming at that time. (Decl. of Ader at para. 7-9.)

3

) Plaintiff, however, objected to being assigned to these products. (Ex. B at ¶ 55-56; Ex. F. at 157-58; 163-64.)

12. Both Ader and Jennifer Vodvarka, another Senior Product Marketing Manager, testified that product marketing managers get moved from one product to another routinely, based on the needs of the business, but their duties and responsibilities are generally the same. (Ex. A at 72-73; excerpts of the transcript of the deposition of Jennifer Vodvarka, attached as Ex. G at 21-22.)

13. There is no evidence that the delay in growth products or Plaintiff's assignment to work on the Company's core products had anything to do with his sexual orientation, disability, or association with any disabled person. (Ex. F at 160-61.)

14. In May 2018, Plaintiff e-mailed Gail Rogers ("Rogers"), Senior Human Resources Manager, to complain that he found his position "a bit narrow focused and that [his] contributions are limited in scope." He did not complain of discrimination in this e-mail. (May 3, 2018 e-mail from Plaintiff to Rogers, attached as Ex. H[3].)

15. Shortly thereafter, Rogers met with Plaintiff to discuss his concerns. (Plaintiff's May 6, 2018 e-mail to Rogers is attached as Ex. I; affidavit of Gail Rogers attached as Ex. J.) Rogers suggested that Plaintiff speak with his Managers, Weremeichik and Sekley-D'Andrea, to clarify expectations. Plaintiff did not complain about discrimination, harassment, or retaliation at this meeting. (Ex. J.)

**Plaintiff Engaged In Inappropriate And Unprofessional Behavior**

16. Plaintiff's dissatisfaction with this role quickly grew into frustration and hostility toward his colleagues and managers. His managers observed that, during meetings, he often

---

[3]Exhibits that bear a header with the word "Exhibit" followed by a number were filed in the CHRO proceeding and produced in this matter as shown. All exhibit numbers can be disregarded for the purposes of this motion.

appeared annoyed or agitated and had angry outbursts in which he spoke to colleagues in a condescending and/or loud voice. (Ex. A at 52-53; Plaintiff's May 30, 2018 e-mail to Ader and Sekley-D'Andrea, attached as Ex. K; Weremeichik's June 5, 2018 e-mail to Sekley-D'Andrea, attached as Ex. L.)

17. Plaintiff had these outbursts both in small and large group settings. Apparently recognizing that his behavior was inappropriate, he frequently apologized afterwards, attributing his behavior to frustration and difficulties in his personal life. For example, at a "Town Hall" meeting for about 40 people in May 2018, Plaintiff raised his voice and expressed anger concerning aspects of the entire Product Marketing organization. He was extremely critical of Wolters Kluwer's business and claimed that his prior employer, a direct competitor, was better. Plaintiff became more and more agitated, spoke in an increasingly loud voice, and would not let go of the topic. (Ex. A at 53-54; Ader Decl. at ¶ 17; Sekley-D'Andrea Decl. at ¶ 14.)

18. Plaintiff later acknowledged that when Sekley-D'Andrea spoke to him about his behavior after this meeting, she called his approach in the meeting "angry" and he further acknowledged that it might have been received as angry. He agreed that his conduct at the meeting was motivated by his "frustration." "I think I came across as being a little hard. So maybe that did resonate with a little bit of maybe anger and frustration. So maybe that could have been received that way." (Ex. K; Ex. F at 123; Sekley-D'Andrea Decl. at ¶ 15-16; Ader Decl. at ¶ 18-19.)

19. Plaintiff also admitted that Ader told him that "My demeanor was inappropriate, how I asked questions was inappropriate ... that I need to see how I am coming across, how I am asking questions." (Ex. F at 80.) He further testified (Ex. F at 121): "Q. In these instances, is it your testimony that there were times he [Ader] said that your demeanor or the way you ask questions is inappropriate? A. Correct."

20. In addition, Plaintiff admitted that some of his co-workers with whom he was on friendly terms commented about how he came across as "angry," "intense," and "overwhelming" in group meetings and he further admitted that at times "my passion came across in the wrong manner...." (Ex. F at 124-25, 127-28.)

21. Plaintiff also severely overreacted to simple directions and made false accusations about his managers. For instance, in May 2018, Weremeichik called Plaintiff to remind him that he was responsible for properly formatting his PowerPoint decks. She advised him to use templates that had already been created and told him that he should only rely on the Company's graphic designer for special projects. Plaintiff became angry and hung up her. He immediately e-mailed Ader, falsely claiming that Weremeichik had told him that he "now need[ed] to be a graphic designer as part of [his] function." (Ex. K; Plaintiff's May 30, 2018 E-mail to Weremeichik, attached as Ex. M; Sekley-D'Andrea Decl. at ¶ 17.)

22. He then e-mailed Sekley-D'Andrea, asking that she get HR involved because his "expertise and talent [were] really being disrespected" by this simple request. (Plaintiff's May 30, 2018 e-mail to Sekley-D'Andrea and Weremeichik, attached as Ex. N.; Sekley-D'Andrea Decl. at ¶ 17.)

23. Later that day, Plaintiff e-mailed Weremeichik apologizing for how he ended that call, acknowledging that his tone had been "heated," and admitted that he had ended the call "abruptly." (Ex. M.)

24. On another occasion, in June 2018, Plaintiff was late to a scheduled call with Weremeichik. Plaintiff messaged her asking to delay the call fifteen minutes. Weremeichik agreed and dialed back in at the new time. Plaintiff left Weremeichik waiting for another ten minutes before he joined the call. Weremeichik asked Plaintiff to notify her in advance next time he is

running late. Instead of apologizing, or simply acknowledging this request, Plaintiff got angry. He threatened to lodge a complaint against Weremeichik because he did not like her "tone" and suggested that his role with the Company was not working out. (Ex. L; Sekley-D'Andrea Decl. at ¶ 18.)

25. In 2019, Plaintiff's behavior became increasingly hostile and unprofessional. On January 23, 2019, at a roundtable discussion meeting with other Hartford employees, Plaintiff stood up and "took over the room and began getting heated, very agitated, talking extremely loudly and would not give up the point he was trying to make ... to the point where this became very uncomfortable" for other people in the meeting. While Plaintiff's initial point about Sales and Marketing was appropriate, his loud and argumentative behavior and refusal to yield the floor was not. (Ex. A at 57-59; Ader Decl. at ¶ 20.)

26. Following the meeting, Ader again spoke with Plaintiff about his behavior and demeanor during the meeting. (Ex. F at 82-84; Ex. A at 60-61; Ader Decl. at ¶ 21.)

27. The following day, January 24, 2019, Plaintiff sent an e-mail to General Manager, Jonah Paransky, complaining about the scope of his role, the relationship between Sales and Marketing, and claiming that the entire marketing team was afraid to tell Barry Ader "what they are really feeling." Contrary to the allegations of the Amended Complaint, paragraph 77, this e-mail makes no mention of Plaintiff's sexual orientation, discrimination, or any conduct that could be construed as discriminatory. (Plaintiff's Jan. 24, 2019 e-mail exchange with Paransky, attached as Ex. O; Ader Decl. at ¶ 22.)

28. Later that day, Ader and Sekley-D'Andrea met with Plaintiff to discuss the concerns he had about his job. (Ex. F at 86-87; Ader Decl. at ¶ 24.)

29. During the meeting, Plaintiff was visibly upset, argumentative, and raised his voice.

When Ader tried to counsel Plaintiff about his behavior at the meeting the previous day, Plaintiff accused Ader of treating him like a child. (Ader Decl. at ¶ 21.) When Sekley-D'Andrea asked Plaintiff how long he expected to continue to need to continue to commute to Chicago to attend to his father, Plaintiff accused her of asking when his father was going to die and stormed out of the meeting. (Ader's Jan. 24, 2019 e-mail to Paransky, attached as Ex. P; Ader's Jan. 24, 2019 e-mail to Rogers, attached as Ex. Q; Sekley-D'Andrea Decl. at ¶ 20.)

30. Thirty minutes later, Plaintiff went to Sekley-D'Andrea's office and apologized for falsely accusing her of asking when his father would die. Plaintiff also sent an e-mail to Ader apologizing for walking out of the meeting. Plaintiff attributed his behavior to "personal difficulties." He also acknowledged that the January 23rd and 24th meetings were "not [his] finer moments." (Ex. Q; Plaintiff's Jan. 24, 2019 e-mail to Ader, attached as Ex. R.; Ader Decl. at ¶ 26.)

31. On January 28, 2019, Plaintiff again e-mailed Ader and Sekley-D'Andrea to apologize for the way he conducted himself and for failing to "compartmentalize" his personal issues. (Plaintiff's Jan. 28, 2019 e-mail to Ader and Sekley-D'Andrea, attached as Ex. S.)

**Plaintiff's Performance Appraisal**

32. Throughout his tenure with Wolters Kluwer, Plaintiff had performance issues with respect to his writing skills, work product quality, communications, project management, and ability to adhere to timelines and meet deadlines. Extensive examples of Plaintiff's performance issues are attached hereto. (Plaintiff's 2018 Performance Appraisal, attached as Ex. T; Samples of emails showing Plaintiff's ongoing performance issues, attached as Ex. U.)

33. In January 2019, Weremeichik, prepared Plaintiff's 2018 Performance Appraisal as part of the Company's annual performance review process, noting that while he performed well

in certain aspects of his job, he had difficulties in several areas, including, written work product quality, communications, project management, and meeting deadlines. (Ex. T.)

34. For example, Plaintiff was responsible for the marketing plans and content strategy for the Legal Holds product launch. Even though he worked on this project for 4-5 months, he failed to deliver work product with the quality and efficiency expected. Plaintiff had similar issues with the Managed Services launch. Weremeichik had to perform a great deal of the work on this project to meet the launch deadline, including many rounds of feedback and having to rewrite entire sections of the content. (Ex. T.)[4]

35. Plaintiff admitted at his deposition that Weremeichik had counseled him about meeting deadlines as early as May 30, 2018, and had criticized his writing abilities weeks before she delivered his performance appraisal. (Ex. F at 186-87, 227.)

36. As a result of these and other deficiencies documented in the Performance Appraisal, Plaintiff was assigned an overall rating of 2 out of 5 ("needs improvement".) (Ex. T.) All three managers agreed with the overall assessment and rating. (Jan. 15, 2019 e-mail concerning Manager Evaluation deadlines, attached as Ex. V.)

37. Wolters Kluwer managers were directed to enter their reviews into the system and save and close them no later than January 17, 2019. They were further instructed not to communicate ratings or start performance review meetings with their direct reports until January 21, 2019. Managers were given until February 28, 2019 to complete review discussions. (Ex. V.)

38. Plaintiff's review discussion with Weremeichik was completed before the February 28, 2019 deadline. (Calendar invitation, notes, and meeting log, attached as Ex. W.)

---

[4]Performance goals are generic to product marketing and are not necessarily tied to any particular product. As a result, performance goals are not always altered when an employee works on a different product. (Ex. A at 71-72).

39. On January 30, 2019, Plaintiff had a discussion with Rogers about his unprofessional conduct and performance issues in which Plaintiff told her that he was having difficulty balancing his work and personal issues. Rogers advised him that he might be eligible for a leave under the Company's FMLA or Short Term Disability ("STD") policies. (Ex. J.)

40. On February 5, 2019, Plaintiff sent a leave request to UNUM, the Company's third party leave administrator, requesting FMLA and STD. UNUM approved Plaintiff's leave and Plaintiff commenced FMLA on February 26, 2019, which was the first day that he became eligible for FMLA leave (FMLA Policy & STD Policy, attached as Ex. X; Plaintiff's Feb. 5, 2019 UNUM leave request and Feb. 6, 2019 e-mail regarding his request, attached as Ex. Y.)

41. After commencing his FMLA leave, Plaintiff had no further interactions with Ader or Sekley-D'Andrea and only received a couple of text messages and an e-mail from Weremeichik about the status of his leave. (Ex. F at 228.)

42. On May 6, 2019, Plaintiff filed a Charge with the Connecticut Commission on Human Rights and Opportunities ("CHRO Charge"), which the Company did not receive until several weeks later. (Ex. B, ¶12.)

43. On May 8, 2019, Plaintiff sent an e-mail to Richard Flynn, Nancy McKinstry, and Maryjo Charbonnier, alleging for the first time that he had been discriminated against on the basis of his sexual orientation. (May 8, 2019 e-mail, attached as Ex. Z.)

44. Prior to filing his CHRO Charge, Plaintiff never complained to anyone in management at Wolters Kluwer about discrimination on any basis, including sexual orientation, disability or any other protected class. (Ex. J; see also Ex. F at 216, 243-44.)

45. Contrary to paragraph 70 of the Amended Complaint, based on the undisputed evidence, Plaintiff never sent an e-mail and never reported any discrimination or retaliation on any

basis to Rogers or anyone else in Human Resources at any time, prior to filing his CHRO Charge on May 6, 2019. (Ex. J; see also Ex. F at 216, 243-44.)

46. Contrary to paragraph 73 of the Amended Complaint, based on the undisputed evidence, Plaintiff never sent an e-mail to Human Resources or Paransky in October 2018 complaining of discrimination or retaliation on any basis. When pressed at his deposition, Suri admitted that he could be mistaken about whether he sent an e-mail complaining of discrimination in October 2018; he stated "anything is possible .... I could be wrong." No such document has ever been discovered or produced by Plaintiff. (Ex. F at 215-16.)

47. Plaintiff alleges that he e-mailed Paransky in January 2019 about Ader's discrimination against him because of his sexual orientation; however, Plaintiff admitted that the e-mail communications he had with Paransky make no mention of discrimination or retaliation on any basis. (Ex. B, ¶ 77; Ex. F at 216; Ex. O)

48. In October 2019, while still on short term disability leave, Plaintiff resigned from his employment with Wolters Kluwer. (Ex. F. at 227-28.)

**Plaintiff Admits That He Never Asked For A Reasonable Accommodation**

49. Plaintiff admitted at his deposition that he never asked for any accommodation during his entire employment with Wolters Kluwer (Ex. F at 88): "Q. Did you request any accommodations during your employment with Wolters Kluwer? A. No, I did not."

**Additional Allegations**

50. The only discriminatory conduct that Plaintiff alleges concerning Sekley-D'Andrea is that: 1) during the January 24, 2019 meeting she allegedly asked when Plaintiff's father was going to die; 2) she was "complicit" in allowing Ader's discrimination by not reporting him to Human Resources; and 3) she was somehow involved in Weremeichik's discussions with Plaintiff

about taking extensive vacation time at the end of 2018. (Amend. Compl. ¶76; Ex. F at 89-90, 98.) Plaintiff admitted that the only comment Sekley-D'Andrea is alleged to have heard was the "petulant schoolgirl" comment allegedly made by Ader in the January 24th meeting. (Ex. F at 89.)

51. The only discriminatory conduct that Plaintiff alleges concerning Weremeichik is that: 1) he felt that she was insufficiently sympathetic to him telling her at various times during one-on-one and team business meetings that he had been assaulted by Mark Antosh ("Antosh")[5], an adult man living in Plaintiff's home in Chicago; 2) she was "complicit" in allowing Ader's discrimination by not reporting him to Human Resources, even though he does not allege that she heard any specific comments or witnessed any discriminatory actions; 3) she micromanaged his work, although he admitted that his co-workers also complained that she micromanaged them; and 4) she attempted to limit his vacation days at the end of 2018. (Ex. F at 98, 100-106, 164-65.)

52. Ader was not aware of Plaintiff's sexual orientation or any alleged disability until after Plaintiff filed his CHRO Charge. (Ex. A at 36-37, 45-46; Ader Decl. at ¶ 11-12.)

Respectfully Submitted,
**EPSTEIN BECKER & GREEN, P.C.**
Attorneys for Defendants
Wolters Kluwer ELM Solutions, Inc., Barry Ader, Karen Sekley-D'Andrea, and Lisa Weremeichik

By: */s/ Elizabeth S. Torkelsen*
Elizabeth S. Torkelsen (ct15210)
One Landmark Square, Suite 1800
Stamford, Connecticut 06901
Telephone: (203) 326-7417
Facsimile: (203) 326-7580
Email: etorkelsen@ebglaw.com

---

[5] Plaintiff alleges that Antosh was his brother and/or his adopted brother. This contention is false. Plaintiff admitted that Antosh has no blood or adoptive relationship with him whatsoever. (Ex. F at 72:13-23).

**CERTIFICATE OF SERVICE**

I hereby certify that on July 14, 2023, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all counsel and pro se parties of record, via electronic mail by operation of the Court's electronic filing system, or via electronic mail on those parties unable to accept electronic filing, including to:

Mark Paul Carey, Esq.
Carey & Associates, P.C.
71 Old Post Rd., Suite One
Southport, CT 06890
mcarey@caplaw.com

*Attorneys for Plaintiff, Dustin Suri*

/s/ *Elizabeth S. Torkelsen*
Elizabeth S. Torkelsen