## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

———————————————————————x
:
DUSTIN SURI,                                  :        Case No. 3:20-cv-01694
:
                              Plaintiff,      :
:
v.                                            :        August 23, 2023
:
WOLTERS KLUWER ELM                            :
SOLUTIONS, INC., BARRY ADER,                  :        **PLAINTIFF'S LOCAL RULE 56(a)2**
KAREN SEKLEY-D'ANDREA, and                    :        **STATEMENT OF FACTS**
LISA WEREMEICHIK,                             :        **IN OPPOSITION TO**
:        **SUMMARY JUDGMENT**
Defendants.                                   :
:
———————————————————————x

Plaintiff Dustin Suri ("Plaintiff" or "Suri") submits this Statement of Facts, pursuant to

Local Rule 56(a)(2), in opposition to Defendants Wolters Kluwer ELM Solutions, Inc., Barry Ader,

Karen Sekley-D'Andrea, and Lisa Weremeichik, (collectively, "Defendants"), Motion for

Summary Judgment.

1.      Wolters Kluwer ELM Solutions goes to market as ELM Solutions, a Wolters

Kluwer business unit (hereinafter "Wolters Kluwer" or the "Company"). It is a market-leading

provider of enterprise legal management and spend software, contract lifecycle management, and

legal analytics solutions. Wolters Kluwer's primary location is in Hartford, Connecticut, and it has

another office in Houston, Texas. (Declaration of Barry Ader ("Ader Decl.") at ¶ 3; Excerpts of

the transcript of the deposition of Barry Ader, attached as Ex. A, at 22.)

**RESPONSE:** Plaintiff admits this fact but notes that this fact is not material.

2.      Defendant Barry Ader ("Ader") is the Vice President, Product Marketing and

Management, for Wolters Kluwer. (Amend. Complaint, attached as Ex. B, ¶ 18; Answer to the

Amend. Complaint, ("Answer"),[1] attached as Ex. C, ¶ 18.)  Defendant Karen Sekley-D'Andrea ("Sekley-D'Andrea") is the Head of Marketing for Wolters Kluwer. (Ex. B, ¶ 19; Ex. C, ¶ 19.) Defendant Lisa Weremeichik ("Weremeichik") is the former Director of Product Marketing for Wolters Kluwer. (Ex. B, ¶ 20; Ex. C, ¶ 20.)

>    **RESPONSE:** Plaintiff admits this fact but notes that this fact is not material.

>    3.    In February 2018, Wolters Kluwer hired Plaintiff as a Senior Product Marketing Manager, and he began working for Wolters Kluwer on February 26, 2018. (February 6, 2018 Offer Letter, attached as Ex. D; Ex. B, ¶ 32.)

>    **RESPONSE:** Plaintiff admits this fact but notes that this fact is not material.

>    4.    Plaintiff reported to Sekley-D'Andrea until April 2018, when he began reporting to Weremeichik following her promotion to Director of Product Marketing. (Ex. B, ¶ 29, 31.)

>    **RESPONSE:** Plaintiff admits this fact but notes that this fact is not material.

>    5.    As a Senior Product Marketing Manager, Plaintiff worked with product management, sales and account management, marketing communications, and other teams within the organization to ensure the effective implementation of Wolters Kluwer's products and business go-to-market strategy. (Senior Product Marketing Manager job description, attached as Ex. E.)

>    **RESPONSE:** Plaintiff admits this fact but notes that this fact is not material.

>    6.    During Plaintiff's interview, he told Sekley-D'Andrea, that he lived in Chicago and wanted to work partially remotely, so he could travel back to Chicago to help take care of his father. Sekley-D'Andrea told him that the position required that he be in the Hartford office three days a week, but that he could work from wherever he chose on the other two days. ((Ex. B, ¶¶ 15, 33-36; Declaration of Karen Sekley-D'Andrea ("Sekley-D'Andrea Decl.") at ¶ 4.)

---

[1] Each defendant filed a separate Answer to Plaintiff's Amended Complaint. All references to "Answer" herein are references to the Answer of the corporate defendant, Wolters Kluwer. The individual defendants' answers differ from the corporate defendant's answers only inasmuch as the individuals lack personal knowledge of certain allegations.

**RESPONSE:** Plaintiff disputes the alleged fact that Sekley-D'Andrea told him that the position required that he be in the Hartford office three days a week, but that he could work from wherever he chose on the other two days. Plaintiff's understanding of his agreement with Sekley-D'Andrea was that he would work two days in Hartford and three days in Chicago. (Excerpts of Plaintiff's deposition transcript, Ex. F, at 38–39.)

7.      Plaintiff's offer letter and job description also explicitly state that his position is based in Hartford, that he was expected to report to the Hartford office, and that the position is not fully remote. (Ex. D; excerpts of Plaintiff's deposition transcript, attached as Ex. F, at 20-21.)

**RESPONSE:** Plaintiff disputes the alleged fact that his offer letter explicitly states that his position is based in Hartford and that the position was not fully remote. Nowhere in Plaintiff's offer letter does it state that his position is based in Hartford and that it is not fully remote. In relevant part, Plaintiff's offer letter states that "Your official start date will be Monday, February 26, 2018. At this time, we ask that you report to 20 Church Street, Hartford, CT 06103 at 9:00 a.m." (Ex. D.)

8.      There are no managers in *Product Marketing* who work remotely full-time, although some *Product Management* managers work fully remotely. (Ex. A at 31-32)[2].

**RESPONSE:** Plaintiff disputes this fact because the cited testimony does not support this fact. Specifically, the cited portions of Ader's testimony speak to Plaintiff's telecommuting agreement with Sekley-D'Andrea and whether Ader was consulted about whether Plaintiff could telecommute before his hire, not whether any managers in Product Marketing and Product Managers worked remotely full-time. (Ex. A at 31-32.) Further, Plaintiff objects to this fact and the testimony used to support it pursuant to Rule 56(c)(2) of the Federal Rules of Civil Procedure as a fact not supported by admissible evidence.

---

[2] In late 2017, Ader required new Product Marketing staff to report to their physical office on a more regular and frequent basis because, in his business judgment, greater in-person collaboration and accountability would improve the performance of the Product Marketing group that he considered to be underperforming. Ader did not have the same requirement for the Product Management group because he did not believe that group was underperforming at that time. (Decl. of Ader at para. 7-9.)

Under the Federal Rules of Evidence, "a witness may testify to a matter only if evidence is introduced sufficient to support that the witness has personal knowledge of the matter." Fed. R. Evid. R. 602. Ader admitted that he was not a party to the meetings between Plaintiff and Sekley-D'Andrea discussing Plaintiff's telecommuting, and therefore he has no personal knowledge of as to Plaintiff's agreement with Sekley-D'Andrea. (Excerpts of Barry Ader's deposition, Ex. 8 at 31–36.) Plaintiff admits the facts contained in footnote 2.

9.      Over time, Plaintiff began spending even longer periods working remotely. At one point, he was permitted to work alternating weeks in Hartford and in Chicago. While the Company was flexible with Plaintiff in light of his circumstances, the Company never agreed to make this remote arrangement full-time. It is undisputed that the Company never denied Plaintiff the ability to work a partial remote schedule and he, in fact, worked partially remotely until he went on FMLA leave in February 2019. (Ex. A at 39-40; Ex. F at 39.)

**RESPONSE:** Plaintiff denies the alleged fact that Wolters Kluwer never denied Plaintiff the ability to work a partial remote schedule because Barry Ader openly expressed disapproval of the arrangement. Plaintiff testified that when Barry Ader learned of his telecommuting, he told Plaintiff "I don't like this." (Ex. F at 39.)

10.     Plaintiff admitted he was only required to be physically present in a Wolters Kluwer office on two occasions that he had not already planned to be there: once in Hartford, for which he was given 48 hours' notice; and once in Houston, for which he was given eight days' notice. (Ex. F at 47-48, 51-53.)

**RESPONSE:** Plaintiff disputes this fact as to that he was "only" required to be physically present on these two occasions. Despite knowing about his caretaking duties, for the occasion when he was given only 48 hours of notice, Weremeichik presented him with an ultimatum that if he did not go, he would be fired. (Ex. F at 47–48.) They neglected to send him the invitation for the meeting which

4

he was given eight days of notice. (Ex. F at 51–53.) In light of their knowledge of his caretaking duties and the short notice, Plaintiff viewed these requests as unreasonable. (Ex. F at 47–48.)

11.      Two of the three growth products that Plaintiff had expected to work on were delayed; however, Plaintiff did work extensively on the third growth product, Legal Holds. Due to these delays, Plaintiff was assigned to work on two existing core technology products, Passport and TyMetrix 360, in addition to Legal Holds. (Ex. F at 157-58, 163-64.) Passport and TyMetrix 360 were, and are, among the Company's most important products. (Decl. of Sekley-D'Andrea at) Plaintiff, however, objected to being assigned to these products. (Ex. B at ¶ 55-56; Ex. F. at 157-58; 163-64.)

**RESPONSE:** Plaintiff disputes the alleged fact that he objected to being assigned Passport and TyMetrix 360. Plaintiff did not object to being assigned these products; rather, he was "dissatisfied" with the fact that he would be reporting to Weremeichik because he knew from his previous experience working with her that she consistently micromanaged others. (Ex. F at 164–65.)

12.      Both Ader and Jennifer Vodvarka, another Senior Product Marketing Manager, testified that product marketing managers get moved from one product to another routinely, based on the needs of the business, but their duties and responsibilities are generally the same. (Ex. A at 72-73; excerpts of the transcript of the deposition of Jennifer Vodvarka, attached as Ex. G at 21-22.)

**RESPONSE:** Plaintiff admits this fact but notes that this fact is not material.

13.      There is no evidence that the delay in growth products or Plaintiff's assignment to work on the Company's core products had anything to do with his sexual orientation, disability, or association with any disabled person. (Ex. F at 160-61.)

**RESPONSE:** Plaintiff admits this fact but notes that this fact is not material.

14.      In May 2018, Plaintiff e-mailed Gail Rogers ("Rogers"), Senior Human Resources

Manager, to complain that he found his position "a bit narrow focused and that [his] contributions are limited in scope." He did not complain of discrimination in this e-mail. (May 3, 2018 e-mail from Plaintiff to Rogers, attached as Ex. H[3].)

**RESPONSE:** Plaintiff admits this fact but notes that this fact is not material.

15.     Shortly thereafter, Rogers met with Plaintiff to discuss his concerns. (Plaintiff's May 6, 2018 e-mail to Rogers is attached as Ex. I; affidavit of Gail Rogers attached as Ex. J.) Rogers suggested that Plaintiff speak with his Managers, Weremeichik and Sekley-D'Andrea, to clarify expectations. Plaintiff did not complain about discrimination, harassment, or retaliation at this meeting. (Ex. J.)

**RESPONSE:** Plaintiff disputes the alleged fact that he did not complain about discrimination, harassment, or retaliation during his May 6, 2018 meeting with Rogers. Plaintiff testified that at this meeting, he told Rogers that there were issues having to do with his sexual orientation as well as discrimination due to his caretaking responsibilities. (Excerpts of Plaintiff's Deposition, attached as Ex. 1, at 204–06.)

16.     Plaintiff's dissatisfaction with this role quickly grew into frustration and hostility toward his colleagues and managers. His managers observed that, during meetings, he often appeared annoyed or agitated and had angry outbursts in which he spoke to colleagues in a condescending and/or loud voice. (Ex. A at 52-53; Plaintiff's May 30, 2018 e-mail to Ader and Sekley-D'Andrea, attached as Ex. K; Weremeichik's June 5, 2018 e-mail to Sekley-D'Andrea, attached as Ex. L.)

**RESPONSE:** Plaintiff disputes the alleged fact that his dissatisfaction with his role "quickly grew into frustration and hostility towards his colleagues and managers" as an argumentative

---

[3] Exhibits that bear a header with the word "Exhibit" followed by a number were filed in the CHRO proceeding and produced in this matter as shown. All exhibit numbers can be disregarded for the purposes of this motion.

characterization of record evidence. Furthermore, Plaintiff was on friendly terms with many of his colleagues. (Ex. F at 125, 127–28.) Plaintiff also disputes that the alleged behavior occurred as described in the fact. The exhibits cited do not support Plaintiff's behavior as occurring "often," as well as appearing "annoyed" and speaking to colleagues in a "condescending voice." (Ex. A at 52–53; Ex. K; Ex. L.)

17.     Plaintiff had these outbursts both in small and large group settings. Apparently recognizing that his behavior was inappropriate, he frequently apologized afterwards, attributing his behavior to frustration and difficulties in his personal life. For example, at a "Town Hall" meeting for about 40 people in May 2018, Plaintiff raised his voice and expressed anger concerning aspects of the entire Product Marketing organization. He was extremely critical of Wolters Kluwer's business and claimed that his prior employer, a direct competitor, was better. Plaintiff became more and more agitated, spoke in an increasingly loud voice, and would not let go of the topic. (Ex. A at 53-54; Ader Decl. at ¶ 17; Sekley-D'Andrea Decl. at ¶ 14.)

**RESPONSE:** Plaintiff disputes the alleged fact that Plaintiff had such "outbursts" in small and large group settings as an argumentative characterization as well as that the exhibits cited do not support this alleged fact. (Ex. A at 52–53; Ex. K; Ex. L.) Furthermore, Plaintiff disputes the alleged fact that he recognized that his behavior was inappropriate. Specifically, Plaintiff testified that when he apologizes, he takes ownership of his actions and does not put "all of the blame" on the other party. (Ex. 1 at 185.)

18.     Plaintiff later acknowledged that when Sekley-D'Andrea spoke to him about his behavior after this meeting, she called his approach in the meeting "angry" and he further acknowledged that it might have been received as angry. He agreed that his conduct at the meeting was motivated by his "frustration." "I think I came across as being a little hard. So maybe that did resonate with a little bit of maybe some anger and frustration. So maybe that could have been received that way." (Ex. K; Ex. F at 123; Sekley-D'Andrea Decl. at ¶ 15-16; Ader Decl. at ¶ 18-

19.)

**RESPONSE:** Plaintiff disputes this fact as unsupported by the cited evidence. (Ex. K; Ex. F at 123; Sekley-D'Andrea Decl. at ¶ 15-16; Ader Decl. at ¶ 18-19.) Furthermore, Plaintiff disputes that his "conduct at the meeting was motivated by his frustration." Specifically, he said "it is unfortunate how that was received. Frustrated has been the word. My intention was to help create thoughtful dialogue . . . ." (Ex. K.) Furthermore, he testified that he "felt very passionate," when he was at the meeting, and not "angry." (Ex. F at 123.)

19.     Plaintiff also admitted that Ader told him that "My demeanor was inappropriate, how I asked questions was inappropriate ... that I need to see how I am coming across, how I am asking questions." (Ex. F at 80.) He further testified (Ex. F at 121): "Q. In these instances, is it your testimony that there were times he [Ader] said that your demeanor or the way you ask questions is inappropriate? A. Correct."

**RESPONSE:** Plaintiff disputes this fact as to its quoted language. Plaintiff testified that Ader told him "that [his] demeanor was inappropriate, how [he] asked questions was inappropriate, that [he needed] to see how [he] was coming across . . . ." (Ex. F at 80.) Further, Plaintiff believed that his questions were appropriate for the setting, e.g., at a town hall meeting. (Ex. F at 80–81.)

20.     In addition, Plaintiff admitted that some of his co-workers with whom he was on friendly terms commented about how he came across as "angry," "intense," and "overwhelming" in group meetings and he further admitted that at times "my passion came across in the wrong manner…." (Ex. F at 124-25, 127-28.)

**RESPONSE:** Plaintiff admits this fact.

21.     Plaintiff also severely overreacted to simple directions and made false accusations about his managers. For instance, in May 2018, Weremeichik called Plaintiff to remind him that he was responsible for properly formatting his PowerPoint decks. She advised him to use templates

that had already been created and told him that he should only rely on the Company's graphic designer for special projects. Plaintiff became angry and hung up her. He immediately e-mailed Ader, falsely claiming that Weremeichik had told him that he "now need[ed] to be a graphic designer as part of [his] function." (Ex. K; Plaintiff's May 30, 2018 E-mail to Weremeichik, attached as Ex. M; Sekley-D'Andrea Decl. at ¶ 17.)

**RESPONSE:** Plaintiff disputes the alleged fact that he "severely overreacted" to "simple directions" as an argumentative conclusion without a citation to the record. Plaintiff further disputes that Weremeichik's request was a simple direction because he stated that it was not part of his job function, and so would not be able to execute it properly. (Ex. M at 1.) Plaintiff disputes the alleged fact that he made "false" accusations about his managers because this is an argumentative characterization included in Sekley-D'Andrea's Declaration. (Ex. K; Ex. M; Sekley-D'Andrea Decl. at ¶ 17.) Plaintiff admits the remainder of this fact.

22.     He then e-mailed Sekley-D'Andrea, asking that she get HR involved because his "expertise and talent [were] really being disrespected" by this simple request. (Plaintiff's May 30, 2018 e-mail to Sekley-D'Andrea and Weremeichik, attached as Ex. N.; Sekley-D'Andrea Decl. at ¶ 17.)

**RESPONSE:** Plaintiff disputes this fact as it is an argumentative characterization contained in Sekley-D'Andrea's Declaration. Furthermore, Plaintiff disputes that the request was "simple" because his email indicated that this request was never part of his role, and that he was not told or consulted with to do this task beforehand. (Ex. N at 1.)

23.     Later that day, Plaintiff e-mailed Weremeichik apologizing for how he ended that call, acknowledging that his tone had been "heated," and admitted that he had ended the call "abruptly." (Ex. M.)

**RESPONSE:** Plaintiff disputes that "he had ended the call 'abruptly.'" Plaintiff said that he

"*had to*" end the call abruptly, pointing to Weremeichik's actions such as she was trying to make him execute "a launch in under a minimum of a 12 week window," that he cannot be held "for responsible for duties involving graphic design, and asked for more respect as to the length of their calls as well as how her calls are without notice. (Ex. M.)

24.     On another occasion, in June 2018, Plaintiff was late to a scheduled call with Weremeichik. Plaintiff messaged her asking to delay the call fifteen minutes. Weremeichik agreed and dialed back in at the new time. Plaintiff left Weremeichik waiting for another ten minutes before he joined the call. Weremeichik asked Plaintiff to notify her in advance next time he is running late. Instead of apologizing, or simply acknowledging this request, Plaintiff got angry. He threatened to lodge a complaint against Weremeichik because he did not like her "tone" and suggested that his role with the Company was not working out. (Ex. L; Sekley-D'Andrea Decl. at ¶ 18.)

**RESPONSE:** Plaintiff disputes the alleged fact that Weremeichik "ask[ed] Plaintiff to notify her in advance the next time he [was] running late." Plaintiff was late to the call because he had just been assaulted and was attending to his injuries. (Ex. 1 at 102–04.) When he joined the call, Weremeichik started "screaming at [him] that he [was] 15 minutes late and [he needed] to have respect for people." (Ex. 1 at 102–04.)

25.     In 2019, Plaintiff's behavior became increasingly hostile and unprofessional. On January 23, 2019, at a roundtable discussion meeting with other Hartford employees, Plaintiff stood up and "took over the room and began getting heated, very agitated, talking extremely loudly and would not give up the point he was trying to make ... to the point where this became very uncomfortable" for other people in the meeting. While Plaintiff's initial point about Sales and Marketing was appropriate, his loud and argumentative behavior and refusal to yield the floor was not. (Ex. A at 57-59; Ader Decl. at ¶ 20.)

**RESPONSE:** Plaintiff disputes the alleged fact that his behavior became "hostile and unprofessional" and that his "loud and argumentative behavior and refusal to yield the floor" was not appropriate as an argumentative conclusion contained in Ader's Declaration. (Ader Decl. at ¶ 20.) Furthermore, Plaintiff disputes that his behavior during the January 23, 2019 roundtable discussion made other attendees "uncomfortable." An email dated February 4, 2019 surveying the reactions of the attendees of the meeting with Barry indicated that attendees felt that the forum was appropriate for Plaintiff's comments, specifically noting that "no one seemed particularly bothered by Dustin's comments since the meeting was informal and free flowing." 1/23/2019 Meeting Attendee Survey, attached as Ex. 2, at 1.

26.     Following the meeting, Ader again spoke with Plaintiff about his behavior and demeanor during the meeting. (Ex. F at 82-84; Ex. A at 60-61; Ader Decl. at ¶ 21.)

**RESPONSE:** Plaintiff admits this fact.

27.     The following day, January 24, 2019, Plaintiff sent an e-mail to General Manager, Jonah Paransky, complaining about the scope of his role, the relationship between Sales and Marketing, and claiming that the entire marketing team was afraid to tell Barry Ader "what they are really feeling." Contrary to the allegations of the Amended Complaint, paragraph 77, this e-mail makes no mention of Plaintiff's sexual orientation, discrimination, or any conduct that could be construed as discriminatory. (Plaintiff's Jan. 24, 2019 e-mail exchange with Paransky, attached as Ex. O; Ader Decl. at ¶ 22.)

**RESPONSE:** Plaintiff objects to the alleged fact that the January 24, 2019 email makes no mention of any conduct that could be construed as discriminatory as this is a legal conclusion and not a factual assertion. Plaintiff disputes the alleged fact that he specifically "complained about the scope of his role," but specifically that in terms of his actual duties, he was "doing more administrative work" than "actually doing marketing-sales driven campaigns." (Ex. O at 1.)

28.     Later that day, Ader and Sekley-D'Andrea met with Plaintiff to discuss the concerns he had about his job. (Ex. F at 86-87; Ader Decl. at ¶ 24.)

**RESPONSE:** Plaintiff admits this fact.

29.     During the meeting, Plaintiff was visibly upset, argumentative, and raised his voice. When Ader tried to counsel Plaintiff about his behavior at the meeting the previous day, Plaintiff accused Ader of treating him like a child.  (Ader Decl. at ¶ 21.) When Sekley-D'Andrea asked Plaintiff how long he expected to continue to need to continue to commute to Chicago to attend to his father, Plaintiff accused her of asking when his father was going to die and stormed out of the meeting. (Ader's Jan. 24, 2019 e-mail to Paransky, attached as Ex. P; Ader's Jan. 24, 2019 e-mail to Rogers, attached as Ex. Q; Sekley-D'Andrea Decl. at ¶ 20.)

**RESPONSE:** Plaintiff disputes the fact that he was "visibly upset, argumentative, and raised his voice" as an argumentative characterization of record evidence contained in Ader's Declaration. (Ader Decl. at ¶ 21.) Furthermore, Plaintiff disputes that Sekley-D'Andrea asked Plaintiff how long he expected to continue to need to continue to commute to Chicago to attend to his father. Sekley-D'Andrea asked when Plaintiff's father was going to die. (Ex. B, ¶ 76; Ex. F at 89; Ex. Z.) Plaintiff admits the remainder of this fact.

30.     Thirty minutes later, Plaintiff went to Sekley-D'Andrea's office and apologized for falsely accusing her of asking when his father would die. Plaintiff also sent an e-mail to Ader apologizing for walking out of the meeting. Plaintiff attributed his behavior to "personal difficulties." He also acknowledged that the January 23rd and 24th meetings were "not [his] finer moments." (Ex. Q; Plaintiff's Jan. 24, 2019 e-mail to Ader, attached as Ex. R.; Ader Decl. at ¶ 26.)

**RESPONSE:** Plaintiff disputes the alleged fact that Plaintiff went to Sekley-D'Andrea's office to apologize for accusing her of asking when his father would die, as the cited evidence does not support that he apologized for doing so. (Ex Q.) Specifically, Ader's email states only that Plaintiff "walked

over to Karen and apologized for accusing her and acknowledging that she did not say what he accused

her of," and therefore never states that he apologized for accusing her of asking when his father would

die. (Ex Q.) Plaintiff admits the remainder of this fact.

31.    On January 28, 2019, Plaintiff again e-mailed Ader and Sekley-D'Andrea to

apologize for the way he conducted himself and for failing to "compartmentalize" his personal

issues. (Plaintiff's Jan. 28, 2019 e-mail to Ader and Sekley-D'Andrea, attached as Ex. S.)

**RESPONSE:** Plaintiff admits this fact.

32.    Throughout his tenure with Wolters Kluwer, Plaintiff had performance issues with

respect to his writing skills, work product quality, communications, project management, and

ability to adhere to timelines and meet deadlines. Extensive examples of Plaintiff's performance

issues are attached hereto. (Plaintiff's 2018 Performance Appraisal, attached as Ex. T; Samples of

emails showing Plaintiff's ongoing performance issues, attached as Ex. U.)

**RESPONSE:** Plaintiff disputes the alleged fact that he had performance issues as stated in the

fact throughout his tenure with Wolters Kluwer. Examples of Plaintiff's good performance are attached

hereto. (Selected emails, attached as Ex. 3, at 1–16.)

33.    In January 2019, Weremeichik, prepared Plaintiff's 2018 Performance Appraisal

as part of the Company's annual performance review process, noting that while he performed well

in certain aspects of his job, he had difficulties in several areas, including, written work product

quality, communications, project management, and meeting deadlines. (Ex. T.)

**RESPONSE:** Plaintiff disputes this fact as to the difficulties identified in the fact. Specifically,

his performance review, in Weremeichik's opinion, identified "challenges with timelines," reliance on

others due to needing to consult others within their sphere of knowledge, and identified improvements

to be made with messaging. (Ex. T)

34.    For example, Plaintiff was responsible for the marketing plans and content strategy

for the Legal Holds product launch. Even though he worked on this project for 4-5 months, he failed to deliver work product with the quality and efficiency expected. Plaintiff had similar issues with the Managed Services launch. Weremeichik had to perform a great deal of the work on this project to meet the launch deadline, including many rounds of feedback and having to rewrite entire sections of the content. (Ex. T.)[4]

**RESPONSE:** Plaintiff disputes the alleged fact that he worked on the product launch of Legal Holds for 4–5 months. Plaintiff's Performance Appraisal states that he worked on "3 months and 2 months on the managed services and legal holds message development respectively." (Ex. T at 3.) Furthermore, his Performance Appraisal does not state that Weremeichik had to perform "a great deal of the work" to meet the launch deadline, but states that his work required "rework, many rounds of edits from [Weremeichik] and others, for Passport, Legal Holds, and managed services materials." Plaintiff admits the remainder of this fact as well as the fact stated in footnote 4.

35.     Plaintiff admitted at his deposition that Weremeichik had counseled him about meeting deadlines as early as May 30, 2018, and had criticized his writing abilities weeks before she delivered his performance appraisal. (Ex. F at 186-87, 227.)

**RESPONSE:** Plaintiff admits this fact.

36.     As a result of these and other deficiencies documented in the Performance Appraisal, Plaintiff was assigned an overall rating of 2 out of 5 ("needs improvement".) (Ex. T.) All three managers agreed with the overall assessment and rating. (Jan. 15, 2019 e-mail concerning Manager Evaluation deadlines, attached as Ex. V.)

**RESPONSE:** Plaintiff disputes the alleged fact that his performance rating resulted from such alleged deficiencies. Plaintiff testified that Ader influenced the rating and the narrative that was

---

[4] Performance goals are generic to product marketing and are not necessarily tied to any particular product. As a result, performance goals are not always altered when an employee works on a different product. (Ex. A at 71-72).

ultimately included into Plaintiff's performance review. (Ex. B, ¶¶ 66, 74; Ex. 1 at 197.) Additionally, Plaintiff's rating was incongruous with his conference with Weremeichik. (Ex. B, ¶ 90; Ex. 1 at 226.)

37.     Wolters Kluwer managers were directed to enter their reviews into the system and save and close them no later than January 17, 2019. They were further instructed not to communicate ratings or start performance review meetings with their direct reports until January 21, 2019. Managers were given until February 28, 2019 to complete review discussions. (Ex. V.)

**RESPONSE:** Plaintiff admits this fact but notes that it is not material.

38.     Plaintiff's review discussion with Weremeichik was completed before the February 28, 2019 deadline. (Calendar invitation, notes, and meeting log, attached as Ex. W.)

**RESPONSE:** Plaintiff admits this fact but notes that it is not material.

39.     On January 30, 2019, Plaintiff had a discussion with Rogers about his unprofessional conduct and performance issues in which Plaintiff told her that he was having difficulty balancing his work and personal issues.  Rogers advised him that he might be eligible for a leave under the Company's FMLA or Short Term Disability ("STD") policies.  (Ex. J.)

**RESPONSE:** Plaintiff admits this fact.

40.     On February 5, 2019, Plaintiff sent a leave request to UNUM, the Company's third party leave administrator, requesting FMLA and STD. UNUM approved Plaintiff's leave and Plaintiff commenced FMLA on February 26, 2019, which was the first day that he became eligible for FMLA leave (FMLA Policy & STD Policy, attached as Ex. X; Plaintiff's Feb. 5, 2019 UNUM leave request and Feb. 6, 2019 e-mail regarding his request, attached as Ex. Y.)

**RESPONSE:** Plaintiff admits this fact.

41.     After commencing his FMLA leave, Plaintiff had no further interactions with Ader or Sekley-D'Andrea and only received a couple of text messages and an e-mail from Weremeichik about the status of his leave. (Ex. F at 228.)

**RESPONSE:** Plaintiff admits this fact.

42.     On May 6, 2019, Plaintiff filed a Charge with the Connecticut Commission on Human Rights and Opportunities ("CHRO Charge"), which the Company did not receive until several weeks later. (Ex. B, ¶12.)

**RESPONSE:** Plaintiff admits this fact.

43.     On May 8, 2019, Plaintiff sent an e-mail to Richard Flynn, Nancy McKinstry, and Maryjo Charbonnier, alleging for the first time that he had been discriminated against on the basis of his sexual orientation. (May 8, 2019 e-mail, attached as Ex. Z.)

**RESPONSE:** Plaintiff disputes the alleged fact that his May 8, 2019 email to Flynn, McKinstry, and Charbonnier was the first time that he alleged discrimination on the basis of his sexual orientation. Plaintiff spoke to Rogers about discrimination as early as May 2018. (Ex. B, ¶ 70, Ex. 1 at 204–06.)

44.     Prior to filing his CHRO Charge, Plaintiff never complained to anyone in management at Wolters Kluwer about discrimination on any basis, including sexual orientation, disability or any other protected class. (Ex. J; see also Ex. F at 216, 243-44.)

**RESPONSE:** Plaintiff disputes the alleged fact that he never complained to anyone in management at Wolters Kluwer about discrimination on any basis, including sexual orientation, disability, or any other protected class. Plaintiff contacted Rogers about the discrimination he was experiencing in May 2018. (Ex. B, ¶ 70, Ex. 1 at 204–06.) Plaintiff had another conversation in June or July 2018 with Rogers regarding the discrimination that he was experiencing. (Ex. B, ¶ 70, Ex. 1 at 199–202).

45.     Contrary to paragraph 70 of the Amended Complaint, based on the undisputed evidence, Plaintiff never sent an e-mail and never reported any discrimination or retaliation on any basis to Rogers or anyone else in Human Resources at any time, prior to filing his CHRO Charge

on May 6, 2019. (Ex. J; see also Ex. F at 216, 243-44.)

**RESPONSE:** Plaintiff disputes the alleged fact that he never sent an email and never reported any discrimination or retaliation on any basis to Rogers or anyone else in Human Resources at any time, prior to filing his CHRO charge on May 6, 2019 on the same ground as set forth in Response to No. 44. (Ex. B, ¶ 70, Ex. 1 at 199–202, 204–06.) Plaintiff testified that he sent Rogers an email complaining of discrimination in June 2018 and October 2018, and in each of the emails, used the expression "sexual orientation discrimination or words to that effect." (Ex. 1 at 209.)

46.     Contrary to paragraph 73 of the Amended Complaint, based on the undisputed evidence, Plaintiff never sent an e-mail to Human Resources or Paransky in October 2018 complaining of discrimination or retaliation on any basis. When pressed at his deposition, Suri admitted that he could be mistaken about whether he sent an e-mail complaining of discrimination in October 2018; he stated "anything is possible … I could be wrong." No such document has ever been discovered or produced by Plaintiff. (Ex. F at 215-16.)

**RESPONSE:** Plaintiff disputes the alleged fact that he never sent an e-mail to Human Resources or Paransky in October 2018 on the same ground as Response to No. 45. (Ex. B, ¶ 73, Ex. 1 at 199–202, 204–06, 210.)

47.     Plaintiff alleges that he e-mailed Paransky in January 2019 about Ader's discrimination against him because of his sexual orientation; however, Plaintiff admitted that the e-mail communications he had with Paransky make no mention of discrimination or retaliation on any basis. (Ex. B, ¶ 77; Ex. F at 216; Ex. O)

**RESPONSE:** Plaintiff admits this fact.

48.     In October 2019, while still on short term disability leave, Plaintiff resigned from his employment with Wolters Kluwer. (Ex. F. at 227-28.)

**RESPONSE:** Plaintiff disputes the alleged fact that he resigned from employment with

Wolters Kluwer. In relevant part: "Q: And at that point, you separated from employment with the company? A. Correct." (Ex. F at 227–28.) In the cited exhibit, Plaintiff never indicated that he voluntarily resigned. (Ex. F at 227–28.)

49.    Plaintiff admitted at his deposition that he never asked for any accommodation during his entire employment with Wolters Kluwer (Ex. F at 88): "Q. Did you request any accommodations during your employment with Wolters Kluwer?  A.  No, I did not."

**RESPONSE:** Plaintiff admits this fact insofar as he did not request any accommodations for himself before he left on short-term disability leave. He made at least two accommodations requests while he was an employee after he went out on FMLA and short-term disability leave. (Plaintiff's requests for accommodation, attached as Ex. 10, at 1–2.)

50.    The only discriminatory conduct that Plaintiff alleges concerning Sekley-D'Andrea is that: 1) during the January 24, 2019 meeting she allegedly asked when Plaintiff's father was going to die; 2) she was "complicit" in allowing Ader's discrimination by not reporting him to Human Resources; and 3) she was somehow involved in Weremeichik's discussions with Plaintiff about taking extensive vacation time at the end of 2018. (Amend. Compl. ¶76; Ex. F at 89-90, 98.) Plaintiff admitted that the only comment Sekley-D'Andrea is alleged to have heard was the "petulant schoolgirl" comment allegedly made by Ader in the January 24th meeting. (Ex. F at 89.)

**RESPONSE:** Plaintiff disputes this fact to add that Sekley-D'Andrea approved of Weremeichik's reduction of Plaintiff's vacation days. (Ex. 1 at 93.) Plaintiff admits the remainder of this fact.

51.    The only discriminatory conduct that Plaintiff alleges concerning Weremeichik is that: 1) he felt that she was insufficiently sympathetic to him telling her at various times during one-on-one and team business meetings that he had been assaulted by Mark Antosh ("Antosh")[5],

---

[5] Plaintiff alleges that Antosh was his brother and/or his adopted brother. This contention is false. Plaintiff admitted

an adult man living in Plaintiff's home in Chicago; 2) she was "complicit" in allowing Ader's discrimination by not reporting him to Human Resources, even though he does not allege that she heard any specific comments or witnessed any discriminatory actions; 3) she micromanaged his work, although he admitted that his co-workers also complained that she micromanaged them; and 4) she attempted to limit his vacation days at the end of 2018. (Ex. F at 98, 100-106, 164-65.)

**RESPONSE:** Plaintiff disputes the alleged fact that the only discriminatory conduct that he alleges concerning Weremeichik are solely on the three bases stated in the fact. After telling Weremeichik about the assaults by Antosh, she: (1) repeatedly referred to Antosh as Plaintiff's son, not his brother; (2) repeatedly asked him why Plaintiff was allowing Antosh to beat him; and (3) why Plaintiff was not strong enough to retaliate. (Ex. F at 99–101.) Additionally, because Weremeichik disapproved of Plaintiff's caretaking duties to his disabled father, she required Plaintiff to reduce his vacation days. (Ex. 1 at 90–94.) Weremeichik's reduction of Plaintiff's vacation days is described in further detail in the section for Additional Material Facts, *infra.* Plaintiff admits the fact stated in footnote 5 insofar as it states that Antosh is not Plaintiff's blood or legally adopted brother.

52.    Ader was not aware of Plaintiff's sexual orientation or any alleged disability until after Plaintiff filed his CHRO Charge. (Ex. A at 36-37, 45-46; Ader Decl. at ¶ 11-12.)

**RESPONSE:** Plaintiff disputes the alleged fact that Ader was not aware of Plaintiff's sexual orientation until Plaintiff filed his CHRO Charge. Management was aware of Plaintiff's sexual orientation as well as association with a disabled person from the start of Plaintiff's interviews. (Ex. 9 ¶ 9.) In addition to making negative remarks about Plaintiff's sexual orientation, Plaintiff observed that Ader was uncomfortable working with him, a gay man. (Ex. 1 at 115–118; Plaintiff's Amended CHRO Complaint and Sworn Affidavit, attached as Ex. 4, ¶ 14.). Further, Plaintiff testified that Ader "knowingly [heard]" that Plaintiff was gay, and that Ader's behavior changed

---

that Antosh has no blood or adoptive relationship with him whatsoever. (Ex. F at 72:13-23).

from that point. (Ex. 1 at 115.) Plaintiff admits the remainder of this fact.

**Additional Material Facts**

1.      Plaintiff identified himself as homosexual from the start of his interviews, for example, by referring to his partner with the pronouns of "he." (Ex. 1 at 113.)

2.      On or about late April or early May 2018, Earl Stoner, Plaintiff's same-sex, domestic partner, met with Karen Sekley-D'Andrea at Wolters Kluwer's Hartford office to discuss the role of Content Marketing Director.  (Ex. B ¶ 38; Earl Stoner's Affidavit, attached as Ex. 9, ¶ 3.) During that meeting, Sekley-D'Andrea inquired about Stoner's relationship with Suri, and discussed their commonalities in dealing with ailing parents, namely Sekley-D'Andrea's father and Suri's father. (Ex. 9 ¶ 8.) At the close of the meeting, it was clear to Stoner that Wolters Kluwer's leadership was on notice of Plaintiff's sexual orientation and caregiver responsibilities. (Ex. 9 ¶ 9.)

3.      Plaintiff never worked remotely full time during his employment at Wolters Kluwer and did not request to work remotely full time. (Ex. 1 at 143–44.)

4.      During Plaintiff's employment at Wolters Kluwer, Vodvarka was permitted to work partially remotely and was in the office less than 20 percent of the time, but she was never reprimanded or threatened for working remotely. (Ex. 4 ¶ 17; Excerpts of Jennifer Vodvarka's Deposition, attached as Ex. 5, at 34–35.)

**Ader Acted with Impermissible Discriminatory Intent Towards Plaintiff**

5.      Plaintiff observed that Ader would get up and move if Plaintiff sat in the chair next to him and when Plaintiff was standing close to him, which was behavior that Plaintiff did not observe when others were in similarly close proximity with Ader, and that Plaintiff believed was because of his sexual orientation. (Ex. 1 at 115–16.)

6.      Plaintiff testified that Ader provided input, including the narrative and the score itself, into what was ultimately included in Plaintiff's performance review. (Ex. 1 at 197.)

21

7.      Ader was aware that Plaintiff was homosexual, and Ader's behavior towards Plaintiff changed after learning that he was homosexual. (Ex. 1 at 115–118; Ex. B ¶ 25, 44.)

8.      On at least three occasions, starting in May 2018, Ader stated to Plaintiff that "people like you need to get their emotions in check," in reference to the sex stereotype that homosexual men are overly emotional (Ex. B ¶¶ 41–42; Ex. 4 ¶ 14–15; Ex. 1 at 118–22; Ex. 8, at 52.)

9.      In response to learning that Plaintiff was assaulted, around April 2018, Ader told Plaintiff to "fight back" and not to be "a patsy." (Ex. B ¶ 61–62; Ex. 1 at 74–75.)

10.     Around late April 2018, Ader told Plaintiff should "man up" and "toughen up" in response to the situation of Plaintiff being physically assaulted (Ex. B ¶ 61–62, 71–72; Ex. 4 ¶ 22.)

11.     Ader twice made comments evidencing animus related to Plaintiff's sexual orientation in January 2019, and around that time, told Plaintiff that he was acting "like a petulant schoolgirl." (Ex. B ¶ 72; Ex. 1 at 87; Ex. 4 ¶ 30.)

12.     Ader remarked to Plaintiff during a January 2019 meeting in Houston that because Plaintiff did not shave, he looked more "macho" (Ex. B ¶ 80–81; Ex. 4 ¶ 30.)

13.     In response to learning that Plaintiff was caregiving for his father, Ader asked why Plaintiff's mother or another female member of Plaintiff's family could not perform this task, and commented that "the things that you're doing, mostly women do." (Ex. 1 at 117–18; Ex. B ¶ 40, 45; Ex. 4 ¶ 16.)

14.     Ader testified that David Moran, another Wolters Kluwer employee, filed a CHRO complaint alleging age discrimination against him. (Ex. 8 at 12, 162.)

**Ader Disapproved of Plaintiff's Caretaking Responsibilities**

15.     Ader testified that there was a point where he learned that Plaintiff was working

remotely, and that he was made aware that his father had cancer "months" into Plaintiff's employment. (Ex. 8 at 34–36.)

16.     When Ader found out about Plaintiff's commuting about six weeks into Plaintiff's employment, his reaction to Sekley-D'Andrea informing him that Plaintiff would be in Chicago and could not attend a meeting, he said "I don't know anything about this," and then looked at both Plaintiff and Sekley-D'Andrea and said to the both of them, "I don't like this." (Ex. 1 at 44–45.) Plaintiff was then asked to leave the room. (Ex. 1 at 45.)

**Weremeichik Disapproved of Plaintiff's Caretaking Responsibilities**

17.     According to Plaintiff's performance appraisal, Weremeichik authored Plaintiff's performance review. (Ex. T at 6.)

18.     Before the end of 2018, Plaintiff sent an email to Weremeichik to plan the use of his fourteen vacation days (Ex. 1 at 90–94; Ex. 3 at 8.)

19.     A week and a half after sending Weremeichik this request, she set up a call with Plaintiff and said to him that "you haven't really been working," i.e., "when you're in Chicago, you're really taking care of your father." (Ex. 1 at 90– 94.) Weremeichik expressed frustration with Plaintiff's caregiving duties in this call, stating that every time that Plaintiff got a phone call from his father's surgeon, she should have required him to clock in and out. (Ex. 1 at 90– 94.)

20.     Weremeichik then insisted that Plaintiff reduce his request for vacation days, and then she would determine whether she would grant his revised request. (Ex. 1 at 90–94.) The next day, understanding that Weremeichik would reduce his vacation days, Plaintiff was compelled to communicate a reduction of three days from the fourteen that he was entitled to. (Ex. 1 at 90– 94.)

21.     Weremeichik thought that reduction in vacation time was too little, but ultimately agreed. (Ex. 1 at 90– 94.) She then stated to Plaintiff that they would "do things differently next year" and would have Plaintiff clock in and out every time he received a phone call. (Ex. 1 at 90–

94.)

22.     When Plaintiff followed up with Sekley-D'Andrea the next week and brought up Weremeichik's reduction of his vacation days, Sekley-D'Andrea indicated that she approved of Weremeichik's actions by "[needing] to let [Weremeichik] run with it." (Ex. 1 at 93.)

**"Deficiencies" Identified in Plaintiff's Performance Cannot Be Attributed to Plaintiff**

23.     Ader testified that of the thirty employees that reported to him within the product management and marketing organization, about five or six work remotely. (Ex. 8 at 41–42.) He specified that one worked in Arizona, one in Colorado, and one in California. (Ex. 8 at 41–42.)

24.     According to Plaintiff's performance appraisal, his performance goals averaged to a "2.75," but his overall rating was a "2." (Ex. T at 6.)

25.     Due to the need to coordinate with other team members, including his managers, to produce work product, Plaintiff experienced delays outside of his control. (Ex. 1 at 187; Samples of emails demonstrating collaborative delays, attached as Ex. 6, at 1–42.)

26.     Other employees complained about Weremeichik's management style, including Jennifer Vodvarka and Deneice Bushnell. (Ex. 1 at 168, 179; Ex. 8 at 80.)

27.     Plaintiff testified that Weremeichik requested excessive amounts of editing, that she would contradict herself in subsequent revisions, and that because of Weremeichik's requirement of multiple revisions, she contributed to the delays in the delivery of their work product. (Ex. 1 at 168–69, 186–87.)

28.     Plaintiff's performance rating of 2.0 was not justified based on his conversation with Weremeichik, during his performance appraisal meeting ,nor by his work product. (Ex. B, ¶ 90, 91; Ex. F at 226–27; Ex T; Ex. 3 at 1–16.)

29.     Plaintiff was not making errors in his work product, conscious of any errors in his work product, but was actively working to ensure that his work product was ready for publication.

(Example of email where Plaintiff self-identified errors, attached as Ex. 7, at 1– 4.)

30.    Management assigned Plaintiff to Tymetrix 360 and Managed Services on January 10, 2019, just before his performance review was issued. (Assignment to T360 and Managed Services, attached as Ex. 13, at 1.)

**Wolters Kluwer Retaliated Against Plaintiff While on Job Protected Leave**

31.    Plaintiff's last day of work at Wolters Kluwer was February 26, 2019. (Dates of Plaintiff's leave, attached as Ex. 11, at 1.)

32.    Plaintiff was on Federal FMLA leave from February 27, 2019 through May 21, 2019. (Ex. 11, at 1–3.)

33.    Plaintiff was on Connecticut FMLA leave from February 27, 2019 to June 19, 2019. (Ex. 11, at 1–3.)

34.    Until October 31, 2019, and while he was still on short-term disability leave, Plaintiff was still an employee of Wolters Kluwer. (Ex. 1 at 227–228; Ex. 11 at 1.)

35.    Plaintiff was on Federal FMLA from February 27, 2019 to May 21, 2019. (Ex. 11, at 1–3.)

36.    Plaintiff made a request for accommodation to Maryjo Charbonnier on May 8, 2019 when he inquired as to transfer to another position in another part of Wolters Kluwer. (Statement of Dustin Suri, attached as Ex. 12, ¶ 12.) He did not receive a response from Charbonnier. (Ex. 12 ¶ 12.)

37.    On June 5, 2019, Plaintiff submitted a request for accommodation to HR to extend his FMLA leave to September 30, 2019. (Plaintiff's requests for accommodation, attached as Ex. 10, at 2; Ex. 12 ¶ 13.) He did not receive a response to these requests. (Ex. 12 ¶ 13.)

38.    On June 7, 2019, Plaintiff's psychiatrist submitted a request for accommodation on his behalf to extend Plaintiff's FMLA leave to September 3, 2019. (Ex. 10 at 1; Ex. 12 ¶ 13.)

In the same letter, Plaintiff's psychiatrist also submitted a reasonable accommodation request in the form of transfer to another business unit, preferably located in Chicago, upon his return from leave. (Ex. 10 at 1; Ex. 12 ¶ 13.)

39.     Plaintiff did not receive any response to his June 5 and June 7, 2019 requests for accommodation. (Ex. B ¶ 101, Ex. 12 ¶ 13.)

40.     Plaintiff made his fourth accommodation request on a phone call with Sonia Durante of Human Resources, requesting to work in a different marketing team, preferably out of the Chicago office or in a telework-eligible position based on his medical recommendations. (Ex. 12 ¶ 15.) In this call, he identified approximately ten open positions published on Wolters Kluwer's careers website that suited his needs. (Ex. 12 ¶ 15.) However, in the same call, Durante denied that there were any positions available, denying Plaintiff's fourth accommodation request. (Ex. 12 ¶ 15.)

41.     Wolters Kluwer did not follow up with Plaintiff regarding his requests for accommodation after June 2019. (Ex. 12 ¶ 16.)

Respectfully submitted,

/s/ Denise M. Clark
Denise M. Clark (phv207460)
Clark Law Group, PLLC
1100 Connecticut Ave, N.W., Suite 920
Washington, D.C. 20036
Tel: (202) 293-0015
Fax: (202) 293-0115
dmclark@benefitcounsel.com

*Attorney for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 23, 2023, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all counsel and pro se parties of record, via electronic mail by operation of the Court's electronic filing system, or via electronic mail on those parties unable to accept electronic filing, including to:

Elizabeth S. Torkelsen
One Landmark Square, Suite 1800
Stamford, Connecticut 06901
Telephone:  (203) 326-7417
Facsimile:  (203) 326-7580
Email: etorkelsen@ebglaw.com

*Attorney for Defendants*

/s/ Denise M. Clark
Denise M. Clark