**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

DUSTIN SURI,
*Plaintiff*,

Case No. 3:20-cv-1694 (OAW)

v.

WOLTERS KLUWER ELM SOLUTIONS, INC., et al
*Defendants*.

## RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff, Dustin Suri, brings this action against his former employer Wolters Kluwer ELM Solutions, Inc. ("WK"), and three WK employees, Barry Ader, Lisa Weremeichik, and Karen Sekley-D'Andrea ("individual defendants"). Plaintiff alleges that he experienced workplace discrimination based on his sexual orientation and disability, and that he was retaliated against for exercising his rights under the Family Medical Leave Act ("FMLA"). He seeks relief under the FMLA, Title VII of the Civil Rights Act ("Title VII"), the Americans with Disabilities Act, as amended ("ADA"), and the Connecticut Fair Employment Practices Act ("CFEPA"). Furthermore, he seeks damages for tortious conduct under state law. Defendants move for summary judgment against Plaintiff on all counts. Defs.' Mem. of Law in Support of Mot. for Summ. J., ECF No. 127 (hereinafter "Motion"). The court has reviewed Defendants' motion, Plaintiff's response thereto, Pl.'s Mem. in Opp., ECF No. 135 (hereinafter "Opp."), Defendants' reply, Defs.' Reply, ECF No. 136 (hereinafter "Reply"), as well as the record in this case. For the foregoing reasons, Defendants' motion is **GRANTED.**

# I. BACKGROUND[1]

The facts set forth below are taken primarily from the parties' Local Rule 56(a) Statements and exhibits and are undisputed unless otherwise stated.[2] Pursuant to District of Connecticut Local Rule 56(a)1, each material fact set forth in the moving party's Local Rule 56(a)1 statement and supported by the evidence "will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement" of the non-moving party. D. Conn. L. Civ. R. 56(a)1. Therefore, where Plaintiff "fails to appropriately deny material facts set forth" in Defendants' Rule 56(a)(1) statement, "those facts are deemed admitted." *Barone v. Judicial Branch of Conn.*, No. 3:17-cv-644 (VAB), 2019 WL 7283383, at *11 (D. Conn. Dec. 27, 2019) (citation modified).

## A. Plaintiff's Employment at WK

WK provides legal management software, spend software, and legal analytics tools to professional organizations. Defs.' Local Rule 56(a)1 Statement of Undisputed Facts ¶ 1, ECF No. 129 (hereinafter "Defs.' SOF"). ¶ 1. Defendant Barry Ader ("Ader") is the Vice President of Product Marketing and Management for WK. *Id.* ¶ 2. Defendant Karen Sekley-D'Andrea ("Sekley-D'Andrea") is the Head of Marketing for WK. *Id.* Defendant Lisa Weremeichik ("Weremeichik") is the former Director of Product Marketing for WK.

[1] All pagination herein is as generated by the court's CM/ECF system, and from any document therein.

[2] Although Plaintiff repeatedly referred to his amended complaint as a source of evidence in his opposition to Defendants' motion for summary judgment, only a "verified complaint is to be treated as an affidavit for summary judgment purposes." *Jordan v. LaFrance*, No. 3:18-cv-01541 (MPS), 2019 WL 5064692, at *3 (D. Conn. Oct. 9, 2019) (quoting *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)). Plaintiff's amended complaint is not a verified complaint; therefore, it will not be considered in determining whether material issues of fact exist for summary judgment purposes.

Plaintiff began working for WK as a Senior Product Marketing Manager on February 26, 2018. *Id.* ¶ 3. He is a gay man. Am. Compl. ¶ 21, ECF No. 21; Def. WK Answer ¶ 21, ECF No. 26. Plaintiff alleges that he suffers from generalized anxiety disorder ("GAD") and obsessive-compulsive disorder ("OCD"), and that he was diagnosed with post-traumatic stress disorder ("PTSD") after he went on leave from WK. Am. Compl. ¶ 22. He claims that he informed Defendants about his GAD and OCD upon being hired. *Id.* Defendants dispute whether and when they were notified about Plaintiff's sexual orientation and disability status prior to this action. *See* Defs.' SOF ¶ 52.

Defendants maintain that during Plaintiff's interview, Sekley-D'Andrea told him that he would be required to work in the Hartford office at least three days a week, and he could work from "wherever he chose on the other two days." *Id.* ¶ 6. Plaintiff maintains that he and Sekley-D'Andrea agreed that he could work "two days in Hartford and three days in Chicago," where he cared for his father. *See* ECF No. 129-6 at 5. Besides indicating that Plaintiff was to report to the Hartford office on his first day of work, Plaintiff's offer letter did not address the parameters of a remote work schedule. *See* ECF No. 129-4.

After Plaintiff began work, he requested an adjustment to his remote-work arrangement, asking to spend "[o]ne week in Hartford and one week home in Chicago." ECF No. 129-1 at 7–8. WK accommodated this request on a temporary basis, though it "never agreed" to make this remote arrangement permanent. Defs.' SOF ¶ 9. Furthermore, Plaintiff claims that approximately six weeks after beginning work, Ader told

him, "I don't like this," upon learning that he worked partially from Chicago. ECF No. 135-2 at 3–4.[3]

On one occasion, Plaintiff was required to be physically present at the Hartford office on a day he was not already planning to be in the office. Defs.' SOF ¶ 10. He was given 48 hours' notice. *Id.* Plaintiff maintains that it was implied that if he did not attend, he would be let go. ECF No. 129-6 at 7–8. On another occasion, Plaintiff was given eight days' notice that he was expected to attend an in-person meeting in Houston, Texas. *Id.* at 9. In this instance, Plaintiff's employment was not threatened in any way in connection with the in-person meeting in Houston. *Id.* at 11.

### B. <u>Plaintiff's Interactions with Coworkers</u>

At times, Plaintiff came across as "angry," "intense," and "overwhelming" to his co-workers during group meetings. Pl.'s SOF ¶ 20. Plaintiff acknowledged that his "passion" could come across "in the wrong manner" to coworkers. *Id.*

One such instance took place in May 2018. During an off-site event, Plaintiff publicly expressed frustration about his team's organization. *See* ECF No. 129-11 at 1. Afterwards, Sekley-D'Andrea called Plaintiff and told him that she perceived his behavior as "angry." *Id.* At the time, Plaintiff disputed this and instead characterized his behavior as "frustrated."[4] *Id.* Plaintiff elevated this conversation to Ader, elaborating that he saw "potential for amazing success" for his team, but he felt "tired of hitting a brick wall." *Id.*

[3] In late 2017, before Plaintiff joined WK, Ader required new product marketing staff to report to their physical offices "on a more regular and frequent basis." Defs.' SOF at 3 n.2. This change was prompted by Ader's belief that the product marketing group was underperforming. *Id.*

[4] Plaintiff later acknowledged that his passion during the meeting could have been received as "anger and frustration." ECF No. 129-6 at 32.

Additionally, there was tension between Plaintiff and his direct manager, Weremeichik. Plaintiff initially reported to Sekley-D'Andrea, but in April 2018 he began reporting to Weremeichik after the latter was promoted to Director of Product Marketing. Pl.'s SOF ¶ 4. Plaintiff was "dissatisfied" with this arrangement because he believed Weremeichik "micromanaged" others' work. *Id.* ¶ 11.

On May 30th, 2018, Weremeichik and Plaintiff had a phone conversation during which Weremeichik expressed her expectation that Plaintiff create certain visual presentations. *See* ECF No. 129-13. In response, Plaintiff's "tone got heated" and he "had to end the call abruptly." *Id.* Later that day, Plaintiff emailed Weremeichik to "apologize" for how he ended the call but also to inform her that creating the presentations she requested is not part of his "skillset." *Id.* Plaintiff also emailed Sekley-D'Andrea about this incident and suggested that they "probably need to get HR involved," because his "expertise and talent" were being "disrespected." ECF No. 129-14.

On June 5, 2018, Plaintiff and Weremeichik came into conflict again. Before a scheduled Skype call, Plaintiff asked Weremeichik to delay the call by 15 minutes. Defs.' SOF ¶ 24. Weremeichik dialed in at the rescheduled time, though Plaintiff did not dial in for another ten minutes. *Id.* Plaintiff and Weremeichik have different accounts of what happened after Plaintiff entered the call: Weremeichik says that Plaintiff told her he was late because he was "having skype issues." ECF No. 129-12. She claims she asked him to "please try to start our meetings on time so they can end on time" and that next time he should give her notice if he is running late. *Id.* She claims that in response to this, Plaintiff threatened to lodge a complaint about her and said, "he did not think this was

working out." *Id.* Weremeichik asked if he was resigning, and he told her he would contact her once he "cooled off." *Id.*

According to Plaintiff, he was late to the call because he was assaulted by a family member. *See* ECF No. 135-2 at 16–17. He alleges that when he dialed into the call, his "nose was bleeding," and he had "a black and blue eye."[5] *Id.* at 17. Weremeichik emailed Sekley-D'Andrea about this Skype call and made no mention of Plaintiff being injured or having been assaulted. *See* ECF No. 129-12. Plaintiff also alleges that after he dialed into the call, Weremeichik started "screaming" at him, and told him he needs "to have respect for people." ECF No. 135-2 at 17.

In December 2019, Plaintiff sought to use 14 vacation days. ECF No. 135-2 at 12. He alleges that in response, Weremeichik scheduled a meeting with him in which she accused him of "not really working," while teleworking from Chicago, and saying he is "really taking care of [his] father" when he is in Chicago. *Id.* He further alleges that she said he did not "really have 14 days of vacation time" because of the time he had spent coordinating his father's care. *Id.* at 12–13. He claims that she prompted him to propose a different number of vacation days, which she would approve, and he returned to her with 11 vacation days. *See id.* at 13–14. Plaintiff claims he proposed 11 vacation days, and she accepted this proposal. *Id.* He further alleges that she said, "next year we are going to do this a lot differently" and she would have him "clock in and clock out every time" he received a phone call. *Id.* He alleges that he did not go to human resources

[5] The court understands that Plaintiff refers to the June 5, 2018, call in his deposition on pages 15–17 at Docket Number 135-2. Plaintiff cites these pages in his response Defendants' discussion of the call in their 56(a)1 statement of facts. Pl.'s SOF ¶ 24.

about this incident because he did not believe they would assist him. ECF No. 129-6 at 22.

On January 23, 2019, at a team meeting, Plaintiff again publicly shared his frustration about his team and his role. Defs.' SOF ¶ 25; *See* ECF No. 135-3 at 3. Ader said that Plaintiff's demeanor was "agitated", and he was "talking extremely loudly." ECF No. 129-1 at 14. None of the meeting attendees "seemed particularly bothered" by Plaintiff's comments, though most felt that "his concerns would be better expressed in a [one-one-one] meeting." ECF No. 135-3 at 2. Ader spoke with Plaintiff about his demeanor and behavior after the meeting. Pl.'s SOF ¶ 26.

The following day, Plaintiff emailed General Manager Jonah Paransky about his comments during the meeting. ECF No. 135-3 at 3. In relevant part, Plaintiff called himself as a "change agent," who has been "met with a lot of resistance" since his arrival. *Id.* He complained about "a wall between [the] sales and product marketing" teams that he has sought to "break down." He also complained that his "talent" to overcome specific strategic challenges "is not being embraced." *Id.* He concluded by expressing disappointment that his coworkers "are uncomfortable with someone that actually wants to really contribute and not just fill a seat." *Id.* He did not mention discriminatory conduct due to his sexual orientation or disability. *See id.*

On January 24th, Plaintiff met with Ader and Sekley-D'Andrea. Pl.'s SOF ¶ 28. He alleges that during the meeting, Sekley-D'Andrea asked him when his father was going to pass away. *Id.* ¶ 29; *see also* Am. Compl. ¶ 76. Defendants claim that Plaintiff "accused" Sekley-D'Andrea of asking this question during the meeting, and that she "vehemently denied saying anything to this affect." ECF No. 129-17 at 2; Defs.' SOF ¶

29. Defendants acknowledge that she asked how long Plaintiff "expected to continue to need to continue to commute to Chicago to attend to his father." Defs.' SOF ¶ 29. The meeting ended when Plaintiff "stormed out." Pl.'s SOF ¶ 29.

On January 28th, Plaintiff emailed Ader and Sekley-D'Andrea to apologize for his conduct during the January 24th meeting and for failing to "compartmentalize" his personal issues. ECF No. 129-19.

### C. Plaintiff's Allegations

Plaintiff alleges that Ader made discriminatory comments towards him throughout his tenure at WK.[6] Ader testified in his deposition that he was unaware of Plaintiff's sexual orientation until after he filed his CHRO charge. ECF No. 129-1 at 9–10.

Plaintiff claims that in April 2018, he told Ader his brother had physically attacked him.[7] ECF No. 135-2 5, 6. He claims that in response, Ader said, "that is a shame," and asked Plaintiff if he "hit him back." *Id.* at 6. Ader also told Plaintiff he "can't act like a patsy." *Id.*

Additionally, Plaintiff says he perceived a "shift" in Mr. Ader's behavior around him after he learned that Plaintiff is gay. ECF No. 135-2 at 20. Plaintiff claims he noticed that Ader made efforts to stay physically distant from him. *Id.* at 20–21. Once, Plaintiff went into a meeting and sat in a chair next to Ader, who then "got up and moved." *Id.*

---

[6] The record evidence Plaintiff submits to corroborate these comments are (1) his own deposition testimony, ECF No. 135-2; ECF No. 129-6, (2) his State of Connecticut Commission on Human Rights and Opportunities (CHRO) sworn amended complaint, ECF No. 135-2, and (3) and an email he sent on May 8, 2019, to WK Chief Executive Officer Richard Flynn, ECF No. 129-26.

[7] Plaintiff refers to Mark Antosh as his 'brother' or 'adoptive brother' throughout his deposition testimony. *See, e.g.*, ECF Nos. 129-6 at 12, 135-2 at 74. Plaintiff says that while Mr. Antosh is not biologically related to him, or legally his adoptive brother, he "is very much like" his brother and has "been part of [Plaintiff's] family" for at least ten years. ECF No. 129-6 at 12. Additionally, Plaintiff says that Mr. Antosh has a personality disorder and impulse control issues. *Id.*

After Ader learned that Plaintiff was his father's caretaker in Chicago, Plaintiff alleges that Ader asked him why any of Plaintiff's female family members, like a mother or sister, were not in the caretaking role. *Id.* at 22. Plaintiff claims that Ader said "the things that you're doing, mostly females do." *Id.* at 22–23.

Plaintiff also claims that following a company town hall meeting during which Plaintiff asked questions, Ader pulled him aside to criticize his demeanor. *See* ECF No. 135-2 at 7–8. He allegedly told Plaintiff that "everything about [him] was inappropriate," and told him to consider how he was "coming across" when he asked questions. *Id.* Plaintiff claims that on at least one other occasion, Ader criticized how Plaintiff spoke at a team meeting. *Id.* at 9. He also testifies that when Ader remarked on how Plaintiff spoke, "it always had to do with – his comment is, you're acting like a girl." *Id.* He alleges that during one meeting with Ader and Sekley-D'Andrea, Ader called him "a petulant schoolgirl." ECF No. 129-6 at 16–17.

Ader testified in his deposition that there were two occasions in which Plaintiff "showed erratic behavior" during team meetings by "raising his voice," "talking extremely loudly," and becoming "agitated." ECF No. 129-1 at 11–14. Ader noted that Plaintiff would make "valid" points, but his delivery would be "very agitated." *See id.* at 15. Plaintiff testified that his coworkers commented that he could come across as "intense" and "overwhelming" while communicating. ECF No. 129-6 at 35–36.

Plaintiff claims that at a meeting in early 2019, Ader approached Plaintiff to comment that he looked different. ECF No. 135-5 ¶ 30. Ader then said "oh, I got it – you did not shave. You look more macho." *Id.*

He also alleges that on two occasions, Ader said "people like you need to get their emotions in check."[8] ECF No. 135-2 at 23–24; *see also* ECF No. 129-26 at 2.

While deposed, Plaintiff testified about three instances in which he complained about discrimination based on his sexual orientation in mid-2018. He alleges that in May 2018, he had a telephone conversation with Gail Rogers and told her there was "bullying" and "issues having to do with" his "sexual orientation," and his "caretaking responsibilities." ECF No. 135-2 at 41. She asked him whether wanted to file a formal complaint, to which he said he was not going "to do that at that time but that [he] would probably do it soon." *Id.*

Plaintiff also claims that in June 2018, he emailed Rogers to "file a complaint of sexual orientation discrimination" and "speak to someone about this as soon as possible." *Id.* at 37–40. Plaintiff did not provide a copy of the email. He alleges that in response, Rogers scheduled a meeting in which she told him he was a "problem child" and that he is "erratic." *Id.* at 39.

Plaintiff finally alleges that he emailed Rogers about sexual orientation discrimination in October 2018, and that he escalated his complaint via email to Jonah Paransky. *Id.* at 44–45. He says that Paransky responded that his "HR business partner is the best one to handle this matter." *Id.* Rogers attests that Plaintiff did not complain of discrimination. ECF No. 129-10 ¶¶ 5–7.

Plaintiff alleges that Sekley-D'Andrea "mocked" or "teased" him based on his sexual orientation or disability. As evidence, he testified in his deposition to her presence

[8] Plaintiff argues that Ader used this expression "on at least three occasions." Am. Compl. ¶ 41; Pl.'s Reply 10, ECF No. 135. However, in his deposition, Plaintiff claims that Ader used this expression twice, and on a third occasion said to "get ahold of your emotions." ECF No. 135-2 at 23-25.

when Ader allegedly called him a "petulant schoolgirl." Plaintiff does not allege any instances in which Sekley-D'Andrea herself mocked or teased him for his sexual orientation or disability. *See* ECF No. 129-6 at 19–20. Rather, he alleges she was "complicit in," "witnessed," and "allowed the behavior," including "the pervasive culture of Barry [Ader]." *Id.* at 20.

He also alleges that Weremeichik "mocked" or "teased" him based on his sexual orientation or disability. As evidence, he refers to her comments about the physical abuse he was suffering from Mr. Antosh. ECF No. 129-6 at 23–24. In one instance, Plaintiff says that she "was non-sympathetic" after learning about an attack. *Id.* She kept referring to Mr. Antosh as Plaintiff's son, rather than his brother, and "kept asking" Plaintiff why he was "allowing" Mr. Antosh "to beat" him. *Id.* at 24. She also asked why Plaintiff was not strong enough to retaliate. *Id.* When asked whether it was possible that Weremeichik misunderstood whether Mr. Antosh was a child, Plaintiff said "it is possible." *Id.* at 24–25. Plaintiff alleges that during a period when "there were a lot of assaults going on," there was "a lack of understanding and a lack of compassion," from Weremeichik, who was "[v]ery stern and unempathetic and there was mockery around it." *Id.* at 28.

**D. <u>Plaintiff's Performance Review</u>**

Plaintiff's manager, Weremeichik, criticized Plaintiff's performance throughout his tenure at WK. *See* ECF No. 129-21. As early as May 2018, she counseled Plaintiff that he was not meeting deadlines. ECF No. 129-6 at 44. In June 2018, Weremeichik expressed concern to Sekley-D'Andrea that Plaintiff's work product was not what she "would expect from a [senior] manager level." ECF No. 129-21 at 1. Between August 2018 and January 2019, Weremeichik repeatedly indicated that Plaintiff's writing skills,

ability to take direction, and ability to meet deadlines did not meet her standards. *See id.* at 10–24. She referred to his work as "pretty disappointing," "incomplete," "poor quality," "choppy," and "creating extra work for the team." *See id.* On multiple occasions, she informed Plaintiff, Sekley-D'Andrea and Ader that Plaintiff was not adequately managing timelines. *See, e.g.*, *id.* at 10, 19-20, 22-23.

In January 2019, Plaintiff was assigned an overall rating of 2 out of 5 in his 2018 annual performance review, indicating he "needs improvement."[9] Defs.' SOF ¶¶ 33, 36; ECF No. 129-20 at 6. Weremeichik, Sekley-D'Andrea, and Ader "agreed with the overall assessment and rating." *Id.* ¶ 36. Defendants maintain that the rating was based on Plaintiff's performance deficiencies as identified in his final review. *See* ECF No. 129-20 at 2–6.

Plaintiff alleges that Ader improperly influenced his performance review. Pl.'s SOF ¶ 36; *see* ECF No. 135-2 at 36. He claims that Ader's alleged animus towards Plaintiff due to his sexual orientation resulted in a low rating that did not reflect his professional performance. Moreover, he argues that the rating was "incongruous" with comments made by Weremeichik during his performance review meeting with her on February 21st or February 22nd. ECF No. 129-23 at 4–5. He alleges that Weremeichik told him in person that she had heard "wonderful things" from a product owner about him, and that he had done a "great job" with an event. ECF No. 135-2 at 46.

**E. <u>Plaintiff's Leave & Departure from WK</u>**

[9] WK managers were directed to enter their reviews into the system no later than January 17, 2019. They were instructed not to communicate ratings or conduct performance review meetings until January 21, 2019, and were given until February 28, 2019, to complete review discussions. Defs.' SOF ¶ 37.

On January 30, 2019, Plaintiff had a discussion with Rogers about Plaintiff's unprofessional conduct and performance issues. Plaintiff told Rogers that he was having difficulty balancing work and personal issues. Rogers advised Plaintiff that he might be eligible for FMLA or Short-Term Disability ("STD") leave. Pl.'s SOF ¶ 39. On February 5, 2019, Plaintiff sent a leave request to WK's third-party leave administrator, UNUM, requesting FMLA and STD. UNUM approved Plaintiff's leave request. Plaintiff took FMLA leave starting February 26, 2019, which was the first day he became eligible for FMLA leave. Pl.'s SOF ¶ 40. Plaintiff had no further interactions with Ader or Sekley-D'Andrea after starting his FMLA leave and only received "a couple of text messages and an e-mail" from Weremeichik about his leave status. Pl.'s SOF ¶ 41.

Plaintiff filed a Charge with the Connecticut Commission on Human Rights and Opportunities ("CHRO Charge") on May 6, 2019. WK did not receive the CHRO Charge until several weeks later. Pl.'s SOF ¶ 42. On May 8, 2019, Plaintiff sent an email to Richard Flynn, Nancy McKinstry, and Maryjo Charbonnier concerning alleged discrimination based on his sexual orientation. Pl.'s SOF ¶ 43. Defendants allege that this was the first time he alleged discrimination on the basis of his sexual orientation, Defs.' SOF ¶ 43; ECF No. 129-26, and that Ader was not aware of Plaintiff's sexual orientation or disability status until he filed the CHRO charge, Defs.' SOF ¶ 52; ECF No. 129-10 ¶¶ 6–7, 10; ECF No. 129-6 at 47. Plaintiff alleges that this was not the first time, as he had spoken to Rogers about discrimination in May 2018, Pl.'s SOF ¶ 43; ECF No. 135-2 at 37–43, and that management was aware of his sexual orientation and disability status, Pl.'s SOF ¶ 52; ECF No. 135-10 ¶ 9 (affidavit of Plaintiff's partner, stating he interviewed for a position at WK and disclosed his relationship with Plaintiff); ECF Nos.

135-2 at 20–23, 135-5 ¶ 14. Plaintiff alleges that he had another conversation with Rogers in June or July 2018 regarding the discrimination he was experiencing. Pl.'s SOF ¶ 44; ECF Nos. 135-2 at 37–40. He alleges that he sent Rogers an email complaining of the discrimination in June and October 2018, using the expression "sexual orientation discrimination or words to that effect." Pl.'s SOF ¶ 45; ECF No. 135-2 at 44. Plaintiff emailed Paransky in January 2019 about Ader and did not mention discrimination or retaliation. Pl.'s SOF ¶ 47.

In October 2019, while on STD leave, Plaintiff left WK. Pl.'s SOF ¶ 48. Defendants allege he resigned, Defs.' SOF ¶ 48, which Plaintiff disputes, Pl.'s SOF ¶ 48. Plaintiff did not request any accommodation prior to taking STD leave. Pl.'s SOF ¶ 49. Plaintiff alleges that he made at least two accommodations requests while on FMLA and STD leave in June 2019. Pl.'s SOF ¶ 49; ECF No. 135-11. These accommodations requests included a letter from Plaintiff and his psychiatrist and requested that his FMLA leave be extended until September 30, 2019, for him to receive PTSD-related treatment, and asked that he be allowed to work from Chicago, permanently. ECF No. 135-11. Plaintiff alleges that he never received any response to his June 2019 accommodation requests. ECF No. 135-1 at 25–26. He alleges that he made a fourth accommodation request on a phone call with Durante, requesting to work on a different marketing team or in a telework-eligible position. He alleges that there were approximately ten open positions, but that Durante "denied that there were any positions available." *Id.* at 26.

## II. <u>LEGAL STANDARD</u>

To prevail on a motion for summary judgment, the movant must demonstrate that there is no genuine issue as to any material fact and it is clear that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court must view "the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. America Piles, Inc.*, 138 F.3d 81, 87 (2d Cir. 1998).

The moving party has the burden of showing that no genuine issue of material fact exists. "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). If the moving party meets its burden, the non-moving party must present "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

To defeat a motion for summary judgment, the non-moving party must demonstrate there is a genuine dispute of material fact for trial. He must offer "significant, probative evidence on which a reasonable fact-finder could decide" in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 256–57. He may not "merely rely upon the allegations contained in the pleadings that raise no more than 'some metaphysical doubt as to the material facts.'" *Anderson v. Romano*, 2010 U.S. Dist. LEXIS 120395, at *7–*8 (S.D.N.Y. Oct. 22, 2010) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, (1986)). Summary judgment is appropriate if the non-moving party fails to establish "the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (quoting *Celotex*, 477 U.S. at 322).

Finally, the United States Court of Appeals for the Second Circuit instructs district courts to be cautious of granting summary judgment in employment discrimination cases "where the employer's intent, motivation, or state of mind is [the material fact] at issue." *Milione v. City Univ. of N.Y.*, 950 F. Supp. 2d 704, 709 (S.D.N.Y. 2013). At the same time "[t]he court's role is to prevent unlawful [employment] practices, not to act as a superpersonnel department that second guesses employers' business judgments." *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002) (citation modified).

## III. DISCUSSION

### A. Abandoned Claims

Plaintiff has abandoned his hostile work environment claim and his state law claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and prima facie tort.

In their motion for summary judgment, Defendants argued that they were entitled to summary judgment on these claims. *See* Motion at 15–18, 27–34. Plaintiff's opposition filing does not provide any argumentation or evidence in support of these claims and affirmatively abandons them. *See* Opp. at 3 n.1, 8 n.4. "[W]hen a counseled party moves for summary judgment, 'a partial response [by the non-movant] arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims.'" *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) (quoting *Jackson v. Fed. Express*, 766 F.3d 189, 195–96 (2d Cir. 2014)).

Therefore, the court deems abandoned Plaintiff's hostile work environment claim and his state tort claims against the individual defendants, and thus grants Defendants' motion as to those claims. *Silverman v. Household Fin. Realty Corp. of N.Y.*, 979 F. Supp. 2d 313, 317 (E.D.N.Y. 2013); *see also Kasprzycki v. DiCarlo*, 584 F. Supp. 2d 470, 478 (D. Conn. 2008) ("Federal Courts may deem a claim abandoned when a party moves of summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way") (citation modified).

**B. Discrimination Based on Sexual Orientation**

Plaintiff brings claims against Defendant WK under Title VII and the CFEPA, alleging employment discrimination based on his sexual orientation.

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The prohibition of sex discrimination encompasses discrimination based on sexual orientation or transgender status. *Mitchell v. Planned Parenthood of Greater N.Y., Inc.*, 745 F. Supp. 3d 68, 89 n.2 (S.D.N.Y. 2024) (citing *Bostock v. Clayton Cnty*, 590 U.S. 644, 651–52 (2020)).

Similarly, the CFEPA prohibits employers from discriminating against employees based on sex, sexual orientation, and other protected statuses. Conn. Gen. Stat. § 46a-60(b)(2). The analysis of discrimination and retaliation claims under the CFEPA and Title VII are "the same," therefore the court shall apply the same standard of review to Plaintiff's

Title VII and CFEPA claims. *Boutillier v. Hartford Pub. Sch.*, 221 F. Supp. 3d 255, 270 (D. Conn. 2016).

Claims based on circumstantial evidence of discriminatory conduct are analyzed under the McDonnell Douglas burden shifting framework. *Porter v. Dartmouth-Hitchcock Med. Ctr.*, 92 F.4th 129, 149 (2d Cir. 2024). Under this framework, the plaintiff's first step is presenting a prima facie case of discrimination by establishing: "(i) membership in a protected class; (ii) qualifications for the position; (iii) an adverse employment action; and (iv) circumstances surrounding that action giving rise to an inference of discrimination." *Collins v. N.Y.C. Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002). The plaintiff's burden at this stage "is not onerous," and once the prima facie case has been shown, "a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors." *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 270 (2d Cir. 2023) (internal citation omitted).

Next, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the adverse employment action." *Id.* (internal quotation and citation omitted). If the employer does so, the burden shifts back to the plaintiff to show either that the employer's stated justification is pretextual or that "even if the employer had mixed motives, the plaintiff's membership in a protected class was at least one motivating factor in the employer's adverse action." *Bart v. Golub Corp.*, 96 F.4th 566, 577, 578 (2d Cir. 2024).

Here, the court finds that Plaintiff meets the "minimal" burden of establishing a prima facie case of discrimination. *Banks*, 81 F.4th at 270. Plaintiff is a gay man who was minimally qualified for his position. He received a low performance rating that

affected his bonus payment, Pl.'s SOF ¶ 36, and according to Plaintiff's deposition testimony, his superiors made comments suggesting animus towards gay men. *See* ECF No. 129-6 at 15. Defendants argue that there is "no evidence to support any claim" that Plaintiff's performance review was the product of discrimination. Motion at 14. But Plaintiff's deposition testimony is evidence that the court must consider, and he testifies to several incidents that, if proven, give rise to an inference of discrimination. Crucially, his burden here has been "characterized as 'minimal' or 'de minimis.'" *Venezia v. Luxoticca Retail N. Am. Inc.*, 2015 WL 5692146, at *3 (S.D.N.Y. Sept. 28, 2015) (quoting *Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005)), *aff'd*, 699 F. App'x 53 (2d Cir. 2017).

The court also finds that WK has met its "burden of producing evidence that the adverse employment actions were taken for a legitimate, nondiscriminatory reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal quotation marks omitted). Defendants submit that Plaintiff received a 2 out of 5 rating because his work was "unsatisfactory and frequently needed to be edited or rewritten and that he missed deadlines on deliverables." Motion at 15. In support they provide ample evidence that Plaintiff's manager, Weremeichik, found his work deficient. Over the course of his tenure at WK, she described his work product to be "pretty disappointing," "incomplete," "poor quality," and that he created "extra work for the team." ECF No. 129-21 at 10–24.

Therefore, the court focuses on the third step of the *McDonnell Douglas* analysis. The United States Court of Appeals for the Second Circuit has observed that a plaintiff may satisfy their burden at this stage by either showing "that the employer's stated reason was false, and merely a pretext for discrimination," or "by producing other evidence

indicating that the employer's adverse action was motivated at least in part by the plaintiff's membership in a protected class." *Bart*, 96 F.4th at 573-74.

Plaintiff does not proffer evidence that the rating was pretext. Rather, he asks the court to act "as a superpersonnel department" and second guess his supervisors' evaluation of his performance. *Alfano*, 294 F.3d at 377. He argues that, while his supervisors "may certainly have thought" that WK had a "legitimate, non-discriminatory reason for rating him a '2' out of '5,'" it "does not mean that their rating was justified." Opp. at 13. He argues that his supervisors did not sufficiently consider that Plaintiff's "collaboration with other team members" contributed to "unavoidable delays." *Id.* at 14. He also states that "issues with Weremeichik's management style," and her habit of requesting "excessive amounts of editing," meant that Weremeichik contributed to delays and her assessment is "unreliable." *Id.* In sum, Plaintiff asks the court to evaluate whether his supervisors' assessment of his ability to manage deadlines and collaborate with others was "inaccurate." *Id.* This is not the court's role. Managing deadlines and collaborating with others are ordinary challenges of a corporate workplace, not evidence that Plaintiff's rating was pretext for discrimination.

Next, Plaintiff argues that his performance rating was motivated at least in part by his sexual orientation. Here, it is Plaintiff's burden to produce "evidence indicating that the employer's adverse action was motivated at least in part by the plaintiff's membership in a protected class." *Bart*, 96 F.4th at 576. It is undisputed that Weremeichik prepared Plaintiff's 2018 performance review and that the "three managers agreed with the overall assessment and rating." Defs.' SOF ¶ 33, 36; *see* Pl.'s SOF ¶ 33, 36. But Plaintiff does not argue that Weremeichik gave him a low rating because of his sexual orientation.

Instead, he argues that she permitted Ader to 'overrule' her and dictate both the review's narrative and the score, and that Ader was motivated by discriminatory animus. Opp. at 11; *see* Am. Compl. ¶ 74.

First, the court notes there is no evidence that Weremeichik was motivated to discriminate against Plaintiff based on his sexual orientation. Plaintiff claims that she "mocked" and "teased" Plaintiff because he is gay. ECF No. 129-6 at 22–24. His evidence is that she was "non-sympathetic" after learning Plaintiff was attacked by Mr. Antosh, she asked Plaintiff why he was "allowing" Mr. Antosh "to beat" him, and she asked why Plaintiff was not strong enough to retaliate.[10] *Id.* at 24–25. These allegations suggest indifference and insensitivity, but they do not support the inference that Weremeichik harbored discriminatory animus towards Plaintiff due to his sexual orientation.

Next, Plaintiff fails to adduce competent evidence indicating that Ader "played a meaningful role" in assigning Plaintiff's performance rating. *Naumovski v. Norris*, 934 F.3d 200, 220 (2d Cir. 2019) (internal citation omitted). A plaintiff can succeed on a Title VII discrimination claim "even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the decision-making process." *Id.* (internal citation and alternations omitted). Here, Plaintiff offers his own deposition testimony, alleging that he "thought" that Ader testified at the CHRO hearing that "he did have some say into the narrative" of Plaintiff's review. ECF No. 135-2 at 36. But he does not provide any record from CHRO proceedings reflecting this assertion. Aside from his own deposition testimony, he cites to his amended complaint filed in the CHRO proceedings, and to his

[10] It is noteworthy that Plaintiff acknowledges that Weremeichik possibly misunderstood whether Mr. Antosh was a child. ECF No. 129-6 at 24–25.

amended complaint filed in the instant matter, which are nearly identical in substance. *Compare* ECF No. 135-5 at 8 ("In fact, Jennifer Vodvarka brought up the so called 'Barry Curve' on the call. This curve is where Barry [Ader] overrules scores"), *with* Am. Compl. ¶ 74 ("In fact, Jennifer Vodvarka brought up the so called 'Barry Curve' on the call. This curve is where Barry overrules scores"). This is insufficient. Plaintiff may not rely "upon the allegations contained in the pleadings that raise no more than 'some metaphysical doubt as to the material facts.'" *Romano*, 2010 U.S. Dist. LEXIS 120395, at *7–*8 (citation omitted); *see also Gordon-Mallett v. Mount Sinai Hosps. Grp., Inc.*, No. 22-CV-1159 (LJL), 2024 WL 1513910, at *12 (S.D.N.Y. Apr. 8, 2024) (finding Plaintiff met her burden on her NYSHRL discrimination claim because it was "undisputed" that she was informed that her colleague who made racist and sexist comments "made the decision not to renew" her contract). Accordingly, there is no triable issue as to whether Ader played a meaningful role in assigning Plaintiff's performance rating.

Plaintiff has not raised a genuine issue of material fact as to whether he suffered discrimination based on his sexual orientation in violation of Title VII and CFEPA. Thus, Defendants are entitled to summary judgment on Count One and Count Six.

### C. Discrimination Based on Disability

Plaintiff brings discrimination and failure to accommodate claims under the ADA and CFEPA. He also brings an associational disability discrimination claim pursuant to the ADA.

#### 1. Discrimination Based on Plaintiff's Disabilities

The court first considers Plaintiff's claim that WK discriminated against him by failing to provide a reasonable accommodation. An employer's failure to accommodate

an employee may constitute disability discrimination under the ADA and CFEPA. *Gomez v. Laidlaw Transit, Inc.*, 455 F. Supp. 2d 81, 86 (D. Conn. 2006) ("Failure to accommodate a disability constitutes discrimination under the ADA"); *see Curry v. Allan S. Goodman, Inc.*, 286 Conn. 390, 415 (2008) ("[W]e adopt the commission's time-tested interpretation construing § 46a–60 (a)(1) to require employers to make a reasonable accommodation for an employee's disability"). To advance such a claim, the plaintiff must prove that "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 (2d Cir.2006) (internal quotation marks and citations omitted).

Here, it is disputed that Plaintiff made a request for a reasonable accommodation. Defendants point out that Plaintiff testified that he "did not" request "any accommodations" during his employment at WK.[11] Defs.' SOF ¶ 49. In his amended complaint and opposition filing, Plaintiff alleges that he made four requests for reasonable accommodations after he went on short-term FMLA leave:

> (1) one on May 8, 2019 as a response to Maryjo Charbonnier, inquiring as to transferring to another part of Wolters Kluwer; (2) another on June 5, 2019 asking to extend his FMLA leave as a reasonable accommodation; (3) another on June 7, through his psychiatrist, asking to extend his FMLA leave and also asking that Suri be granted a transfer to another business

[11] Plaintiff testified that he did not request an accommodation during his tenure at WK:

> Q (Ms. Torkelsen): Did you request any accommodations during your employment with Wolters Kluwer?
> A (Plaintiff): No, I did not.

ECF No. 129-6 at 19. Plaintiff walked back this admission in his Local Rule 56(a)2 statement, claiming that "he did not request any accommodations for himself before he left on short-term disability leave," but he *did* make "at least two accommodations requests while he was an employee after he went out on FMLA and short-term disability leave." Pl.'s SOF ¶ 49.

> unit, preferably located in Chicago, upon his return from leave; and (4) a final request to Sonia Durante of Human Resources, requesting to work in a different marketing team, preferably out of the Company's Chicago office or in a telework-eligible position based on his medical recommendations.

Opp. at 6. He claims that he either "did not receive a response" to his requests for transfer, or in the case of his conversation with Ms. Durante, his request was "outright denied." Opp. at 27. The court will consider these alleged requests.

At this stage, Plaintiff "bears the burdens of both production and persuasion as to the existence of some accommodation that would allow [him] to perform the essential functions of [his] employment, including the existence of a vacant position for which [he] is qualified." *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009).

As to his requests for reassignment to a vacant position, Plaintiff is correct that reassignment may be a reasonable accommodation. 42 U.S.C. § 12111(9). But he must establish "that a vacancy existed into which he or she might have been transferred." *Jackan v. N.Y. State Dep't of Lab.*, 205 F.3d 562, 566 (2d Cir. 2000). To demonstrate a vacant position existed in May and June 2019, Plaintiff only offers his own affidavit testimony in which he testifies that he spoke with Ms. Durante over the phone on an unspecified day in June and, in the process of requesting to "work in a different marketing team" out of WK's Chicago office or in a telework position, he "identified approximately ten open positions" from WK's website that "suited" his needs. ECF No. 135-13 at 4.

This showing is insufficient. Plaintiff offers no additional evidence about the availability of these positions, no evidence that he was qualified for these roles, nor any evidence that he could perform their essential functions. Plaintiff's burden of persuasion "is not satisfied by mere speculation," therefore his argument fails. *Jackan*, 205 F.3d at 566; *see Cayetano v. Fed. Express Corp.*, No. 19-cv-10619, 2022 WL 2467735, at *5

(S.D.N.Y. July 6, 2022) ("Although it is undisputed that these positions were open, Cayetano offers no evidence that he was qualified for these jobs, or that he could perform their essential functions") (citation modified).

As to Plaintiff's requests to extend his FMLA leave, he is correct that medical leave for a finite period may be a reasonable accommodation if it allows the employee to later return to their position and perform the essential functions of their job. *Palmieri v. City of Hartford*, 947 F. Supp. 2d 187, 204–05 (D. Conn. 2013). But Plaintiff does not establish that an extension of FMLA leave would permit him to perform the essential functions of the job in question. *Jackan*, 205 F.3d at 566 ("[T]he claim fails unless the plaintiff establishes that an effective accommodation existed that would render her otherwise qualified") (citation modified). The only colorable evidence he offers is an unsigned email from his psychiatrist to his employer on June 7, 2019, requesting an extension to his FMLA leave "until Tuesday, September 3, 2019." ECF No. 135-11 at 2. The unnamed psychiatrist states that by that date, Plaintiff "should be able to return to work in full-time capacity from Chicago," though he should be "reassigned to a difference business unit," and he should be permitted "to work from home in Chicago or from a local Chicago office." *Id.* Plaintiff provides no evidence or argumentation addressing what the essential functions of his job were or whether the requested medical leave would allow him to perform those functions. The June 7th email is too thin and vague to satisfy Plaintiff's burden of production and persuasion.

Accordingly, the court rejects Plaintiff's claim that WK discriminated against him by failing to provide a reasonable accommodation.

Next, Plaintiff's claim that Defendants otherwise discriminated against him due to his disabilities are incoherent and fail as a matter of law. To establish a prima facie case of discrimination under the ADA, Plaintiff must show: (1) he is a person with a disability within the meaning of the ADA; (2) his employer is subject to the ADA and had notice of Plaintiff's disability; (3) that with or without reasonable accommodation, he was qualified to perform the essential functions of the job at issue; and (4) that he suffered an adverse employment action because of his disability. *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127,134 (2d Cir. 2008). Discrimination claims brought under the CFEPA "are construed similarly to ADA claims," therefore, the court will evaluate these counts simultaneously. *Hopkins v. New England Health Care Emps. Welfare Fund,* 985 F. Supp. 2d 240, 255 (D. Conn. 2013). The only difference in analysis is that the "CFEPA's definition of physical disability is broader than the ADA's." *Id.* (quoting *Beason v. United Techs.*, 337 F.3d 271, 277–278 (2d Cir. 2003)).

The court presumes, without deciding, that Plaintiff is a person with a disability within the meaning of the ADA, and that WK is subject to the ADA and had notice of his claimed disability.

Plaintiff argues that Defendants discriminated against him by "discharging, creating and maintaining discriminatory working conditions, and otherwise discriminating and retaliating against the Plaintiff." Am. Compl. ¶ 127. In his opposition filing, he argues that WK's failure to engage in an interactive process is evidence of disability discrimination, though he also acknowledges that "there is no independent claim under the ADA for failure to engage in the interactive process." Opp. at 20–21 (citing *Sheng v. M&TBank Corp.*, 848 F.3d 78, 86–87 (2d Cir. 2017)). He reiterates his claim that WK

discriminated against him by failing to make a reasonable accommodation, and he suggests that Ms. Durante's alleged immediate rejection of his request to work with a different marketing team "is a strong suggestion of bad faith." *Id.* at 21. At bottom, Plaintiff fails to plead facts showing that with or without reasonable accommodation, he was qualified to perform the essential functions of the job at issue and that he suffered an adverse employment action because of his disability.

Plaintiff has not raised a genuine issue of material fact as to whether he suffered discrimination based on his own disabilities in violation of Title VII and CFEPA. Therefore, Defendants are entitled to summary judgment on Count Three and Count Six.

#### 2. Discrimination Based on Association with a Person with Disabilities

Plaintiff also claims that he was discriminated against based on his association with his father in violation of the ADA. It is undisputed that since the beginning of Plaintiff's employment at WK, the company was aware that he needed to regularly travel to Chicago to care for his father. Defs.' SOF ¶ 6. Plaintiff argues that Ader and Weremeichik discriminated against him because of his caregiving responsibilities. Opp. at 22.

The ADA prohibits employers from "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). Claims for associational discrimination under the ADA are analyzed under the McDonnell Douglas burden shifting framework. Plaintiff must first present a prima facie case by establishing: "1) that she was qualified for the job at the time of an adverse employment action; 2) that she was subjected to adverse employment action; 3) that she

was known at the time to have a relative or associate with a disability; and 4) that the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 432 (2d Cir. 2016).

Next, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Coats v. Fairfield Surgery Ctr., LLC*, No. 3:21-cv-395 (OAW), 2023 WL 6442778, at *5 (D. Conn. Oct. 2, 2023) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43 (2000)). If the employer satisfies this requirement, the burden shifts back to the plaintiff to demonstrate that the stated justification is pretextual. *Id.*

First, Plaintiff argues that his '2' out of '5' performance rating was the product of associational discrimination. He claims that Ader and Weremeichik's comments about his remote-work schedule and about his caretaking responsibilities support a reasonable inference that his father's disability was a determining factor in his poor rating. Opp. at 22–23. He then argues that Defendants' proffered reason for the rating "is pretext," and, without elaborating further, refers back to his argumentation claiming that the rating was pretext for sexual orientation discrimination in violation of Title VII. *See id.* at 23 ("Plaintiff has explained in Section II.C, *supra*, why Defendants' proffered reason is pretext.").

For the purposes of this motion, it is assumed that Plaintiff establishes a prima facie case of associational discrimination as to his performance rating.

Plaintiff's argument that Defendants' proffered explanation—that his rating was due to his poor performance—is pretext, fails. As previously discussed, he does not point to "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's

proffered legitimate, nonretaliatory reasons for its action." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013). Instead, he asks the court to evaluate whether his superiors' rating of his performance "was justified," given the ordinary workplace challenges he faced, for example, Weremeichik's 'micromanagement' of his work. Opp. at 13–14. Thus, Plaintiff's claim fails as it relates to his performance rating.

Next, Plaintiff argues that he was subject to associational discrimination when Weremeichik "pressure[d] him to reduce" his vacation days. *Id.* at 24. Plaintiff argues that the reduction of his vacation days from 14 days to 11 at Weremeichik's prompting constitutes an adverse employment action. The court disagrees. To establish he was subject to an "adverse employment action," Plaintiff must demonstrate that he suffered "a materially adverse change in the terms and conditions of employment." *Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir. 1997). Denial of three vacation days, without any attendant loss of pay, does not rise to the level of an "adverse employment action" required to attach liability under the ADA. *Roman v. Geisinger W.V. Med. Ctr.*, No. 3:20-45, 2022 U.S. Dist. LEXIS 60587, at *20 (M.D. Pa. Mar. 31, 2022) (finding "the plaintiff's loss of a few days of accrued vacation leave is not an adverse employment action since she did not suffer any loss of pay."). The record does not reflect "the sort of total prohibition on vacation required for the Defendant's behavior to constitute an adverse employment action." *Drouillard v. Sprint/United Mgmt. Co.*, 375 F. Supp. 3d 245, 272 (E.D.N.Y. 2019).

Plaintiff has not raised a triable issue of material fact as to whether he suffered discrimination based on his association with a person with disabilities in violation of Title VII. Accordingly, Defendants are entitled to summary judgment on Count Three.

**D. <u>Retaliation</u>**

Plaintiff brings retaliation claims under Title VII, the CFEPA, the ADA, and the FMLA.

### 1. Retaliation Related to Sexual Orientation Discrimination

To establish a claim for retaliation under Title VII and the CFEPA, Plaintiff must show that: (1) "he engaged in protected participation or opposition under Title VII or CFEPA," (2) "the employer was aware of this activity," (3) "that the employer took adverse action against the plaintiff," and (4) "that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." *Byra-Grzegorczyk v. Bristol-Myers Squibb Co.*, 572 F. Supp. 2d 233, 248 (D. Conn. 2008) (citation modified).

As to the first factor, Plaintiff alleges that he opposed unlawful sexual orientation discrimination. Opp. at 16. He claims that "he sent Gail Rogers of Human Resources emails complaining of discrimination in June and October [2018]."[12] *Id.* He also claims that in May 2018 he told Rogers in a telephone conversation that "there was some bullying going on," and "issues having to do with" his sexual orientation. ECF No. 135-2 at 41. Finally, he claims that he elevated his complaints to WK's General Manager of Business, Jonah Paransky, in October 2018 via email. *Id.* at 44. The only evidence of these emails and conversations that Plaintiff offers is his own deposition testimony. *Id.* at 37–40, 44. Even presuming WK knew of Plaintiff's protected activity, and that Plaintiff was fired, and did not resign, Plaintiff fails to demonstrate a causal connection between Plaintiff's complaints about alleged discrimination based on his sexual orientation and his alleged firing. WK points towards many alternative reasons for the alleged adverse employment

[12] Plaintiff appears to mistakenly refer to June and October of 2019 in his opposition filing. The correct year is 2018. Am. Compl. ¶¶ 70, 73

action—notably, Plaintiff's poor work product and performance. ECF Nos. 129-12; 129-16; 129-20 at 3–4, 6; 129-21 at 1–24. Accordingly, Defendants are entitled to summary judgment on Counts Two and Seven.

**2. Retaliation Related to Disability Discrimination**

To establish a claim for retaliation under the ADA and the CFEPA, Plaintiff must present evidence showing (1) that he engaged in protected activity, (2) "that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." *Palmieri v. City of Hartford*, 947 F. Supp. 2d 187, 206 (D. Conn. 2013) (quoting *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F. 3d 208, 223 (2d Cir. 2001)). If Plaintiff establishes a prima facie case, "the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision." *Treglia v. Manlius*, 313 F.3d 713, 721 (2d Cir. 2002). The plaintiff "must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Id.*

As to the first factor, Plaintiff alleges that he opposed unlawful disability discrimination. Opp. at 16. He claims that "he sent Gail Rogers of Human Resources emails complaining of discrimination in June and October [2018]."[13] *Id.* He also claims that in May 2018 he told Rogers in a telephone conversation that "there was some bullying going on," related to his sexual orientation. The only evidence of these emails and conversations that Plaintiff offers is his own deposition testimony. *Id.* at 37–40, 44.

---

[13] Plaintiff appears to mistakenly refer to June and October of 2019 in his opposition filing. The correct year is 2018. Am. Compl. ¶¶ 70, 73

Even presuming that Plaintiff can establish the first two elements, he fails to point to anything in the record, beyond his own deposition testimony, that either shows that WK took a retaliatory action in response to his opposition to unlawful disability discrimination, or that demonstrates a causal connection between Plaintiff's complaints and his alleged firing. WK points towards many alternative reasons for the alleged adverse employment action, including, as noted above, his poor work product and performance, and low performance reviews. ECF Nos. 129-12; 129-16; 129-20 at 3–4, 6; 129-21 at 1–24. Accordingly, Defendants are entitled to summary judgment on Counts Four and Seven.

### 3. <u>Retaliation Related to FMLA</u>

To establish a claim for retaliation under the FMLA, courts use the McDonnell Douglas burden shifting test. *Potenza v. City of N.Y.*, 365 F.3d 165, 168 (2d Cir. 2004). Plaintiff must establish that (1) he exercised rights protected under the FMLA, (2) he was qualified for his position, (3) he suffered an adverse employment action, and (4) the adverse action took place under circumstances that give rise to an inference of retaliatory intent. *Potenza*, 365 F.3d at 168; *Hewitt v. Triple Point Tech., Inc.*, 171 F. Supp. 3d 10, 19 (D. Conn. 2016). If plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its action. *Id.* at 19–20. Plaintiff then must produce evidence wherein a reasonable jury could find that the legitimate business reasons are pretextual. *Hewitt*, 171 F. Supp. 2d at 21. The evidence must be *sufficient*, not just "some evidence." *Id.*; *see also Serby v. N.Y.C. Dep't of Educ.*, 526 Fed. Appx 132, 135 (2d Cir. 2013).

Even presuming that Plaintiff met the first two elements of the test and that he suffered an adverse employment action, he does not show that any action that occurred

supported an inference of retaliation for him having taken FMLA leave. Plaintiff went on FMLA leave, and then STD leave. Although he disputes whether he simply resigned or was in fact discharged for his use of FMLA leave, *see* ECF Nos. 129-6 at 48–49 (showing Plaintiff, in his deposition testimony, stated that he "separated" from his employment with WK), 135-1 ¶ 48 ("Plaintiff never indicated that he voluntarily resigned"), he fails to allege facts or point to anything in the record showing that he was discharged in retaliation for taking FMLA leave. Plaintiff points towards the "2" on his performance review, but the FMLA does not shield an employee from legitimate disciplinary actions—especially when such action relates to poor performance that is unrelated to FMLA leave. *Hewitt*, 171 F. Supp. 3d at 19; *Pearson v. Unification Theological Seminary*, 785 F. Supp. 2d 141, 162 (S.D.N.Y. 2011) (dismissing claim as plaintiff did not establish that she was discharged for taking leave); *Geromanos v. Columbia Univ.*, 322 F. Supp. 2d. 429, 429 (S.D.N.Y. 2004) ("FMLA is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave"). Accordingly, Defendants are entitled to summary judgment on Count Five.

## IV. CONCLUSION

For the reasons discussed herein, the court hereby **GRANTS** Defendants' motion for summary judgment **(ECF No. 126)**. The Clerk of Court is asked to please enter judgment consistent with this order and to close the case.

**IT IS SO ORDERED** in Hartford, Connecticut, this 28th day of August, 2026.

*/s/*
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE